405 So.2d 826 (1981)
LOUISIANA STATE BAR ASSOCIATION
v.
Leo Edward HEYMANN.
No. 66801.
Supreme Court of Louisiana.
September 8, 1981.
Sam J. D'Amico, Baton Rouge, Roland J. Achee, Shreveport, Wood Brown, III, New Orleans, Leonard Fuhrer, Alexandria, Carrick R. Inabnett, Monroe, Harold J. Lamy, New Orleans, Alfred S. Landry, New Iberia, A. Russell Roberts, Metairie, John B. Scofield, Lake Charles, Thomas O. Collins, Jr., New Orleans, for relator-applicant.
Matthew H. Greenbaum, New Orleans, for defendant-respondent.
DENNIS, Justice.
This is an attorney disciplinary proceeding. La.Const. Art. V, § 5(B); Rules of the Supreme Court of Louisiana, Rule 19 (1973); Articles of Incorporation, Louisiana State Bar Association, Article 15, § 8(1) through (8).

Stipulated Facts
The parties have stipulated the following facts pertaining to the conduct of the respondent attorney, Leo E. Heymann:
On or about November 26, 1974, Mr. Heymann presented to a Las Vegas hotel, two checks totaling $50,000 from the Hibernia National Bank, drawn on the Trust Account of Petroleum Helicopters, Inc. and made payable to the respondent. An F.B.I. expert testified that the checks bore a forged signature of a bank officer on their face, but the parties stipulated that Mr. Heymann did not sign the bank officer's name. The credit manager of a hotel in Las Vegas testified that Mr. Heymann was given credit against the two bank checks which he presented to the casino, and that the Hibernia Bank verified the validity of the checks. The Hibernia Bank thereafter dishonored the checks, because according to it, they *827 were forged, and were from a missing batch of checks that had been stolen from the bank.
On March 27, 1975, a Federal Grand Jury in Las Vegas returned an indictment against Mr. Heymann, charging him with violating 18 U.S.C. § 2314, to wit, the unlawful transportation of falsely made and forged bank checks drawn on the Petroleum Helicopter account at the Hibernia National Bank. The indictment was eventually transferred to New Orleans, and was numbered 75-681(A). The trial of Criminal No. 75-681(A) began on February 23, 1976. Mr. Heymann did not contest the fact that the checks he had openly negotiated were later determined to have been stolen or that a forged signature appeared on their face, and a stipulation to this effect was read to the jury. The government offered no proof linking Mr. Heymann to either the theft or the forgeries. On February 26, 1976, Mr. Heymann was convicted of both counts of violating 18 U.S.C. § 2314. On August 17, 1977, the United States Court of Appeals for the Fifth Circuit reversed the conviction, and remanded the case for a new trial, essentially on the grounds that the Government had introduced evidence against Mr. Heymann which should not have been placed before the jury. On March 6, 1979, the case was retried, and Mr. Heymann was again convicted. He was immediately taken into custody and on March 9, 1979 he was sentenced to three years imprisonment on Count I, and to a consecutive three year term on Count IIexecution of the sentence on Count II being suspended. Mr. Heymann also received a probationary term of three years and he must perform (and is performing) community service work over a one-year term. No appeal was taken from this conviction.
On or about December 3, 1975, Mr. Heymann approached Alex Berger, a mortgage banker in New Orleans, and requested a loan of $60,000. As collateral, Mr. Heymann proposed to pledge 2800 shares of stock in the CIT Financial Corporation. The stock was in respondent's name, and it was ascertained on two separate occasions by a brokerage firm acting on behalf of Mr. Berger that the stock was valid. Following the receipt of advice from family advisors, Mr. Berger ultimately sent the stock to the New York headquarters of C.I.T., where it was eventually determined to be counterfeit.
On December 16, 1976, a one-count indictment was filed against Mr. Heymann, charging him with the transportation of falsely made and counterfeit securities in violation of 18 U.S.C. § 2314. On May 12, 1977 this indictment (76-704(D)) was superseded by a seven-count indictment charging appellant with six counts of wire fraud in violation of 18 U.S.C. § 1343 and one count of interstate transportation of falsely made, forged, altered and counterfeit securities in violation of 18 U.S.C. § 2314. The superseding indictment merely added more charges. The facts which made up the Government case remained unchanged. Trial commenced on January 16, 1978. It was stipulated that the stock which Mr. Heymann had pledged was counterfeit, but Mr. Heymann testified that he had absolutely no knowledge of this fact and also testified that he was acting in good faith when he pledged these securities as collateral. Mr. Heymann strenuously maintained that these securities had been given to him by his father only a few months prior to the elder Heymann's death. At the time of the trial, Mr. Heymann was making payments on schedule to Mr. Berger. On January 20, 1978, Mr. Heymann was convicted on all counts. On February 15, 1978, Mr. Heymann was sentenced to a term of three years in prison on Count I, as well as a concurrent three year sentence on Counts II-VII. On February 20, 1979, the conviction was affirmed, and on March 6, 1979, the day the retrial in 75-681 ended, the court ordered that Mr. Heymann be taken into custody. Respondent's financial condition has so deteriorated that by an order entered during August, 1978, Mr. Heymann was permitted to prosecute this appeal In Forma Pauperis.
Leo E. Heymann was incarcerated from March 6, 1979 until December 16, 1980. Thereafter, he was transferred to a "half-way *828 house" in New Orleans until February 26, 1981. He is currently on probation until February 26, 1984 and is performing community service work until February 26, 1982. As a result of his first conviction in 75-681, Mr. Heymann was incarcerated for three months before the Fifth Circuit reversed that verdict. When Mr. Heymann was convicted for a second time in 75-681, the trial judge refused to give Mr. Heymann credit for the time which he had served on an ill-founded conviction.
Commissioner's Findings of Fact Concurred in by Respondent and Committee on Professional Responsibility
After a hearing, the Commissioner filed a report containing his findings of fact and disciplinary recommendation. In addition to the facts concerning the respondent's crime and punishment, the Commissioner determined that: the record suggests that respondent's loss of a major client and investment reverses led to an attempt of financial recovery through gambling, which eventually became addictive. The respondent was suspended from the practice of law because of his convictions on February 21, 1980. During his incarceration, respondent used his time constructively in self-reflection and assessment and in willingly devoting his time and efforts to help in various prison and community programs. His criminal activity did not involve a violation of his duty as an attorney to a client or the misuse of a client's funds. The respondent suffers from a psychological or emotional disorder consisting of a compulsive or addictive gambling habit or disease. He has undergone medical treatment and is attending weekly Gamblers Anonymous counseling sessions. Since his release from the halfway house, the respondent has undertaken employment with diligence and goodwill even though it is menial labor not commensurate with his educational and professional background. He has maintained a close relationship with his children and grandchildren. The respondent has made and intends to continue making a sincere effort to rehabilitate himself and to recover from his illness.
The respondent and the Committee on Professional Responsibility concur in these factual findings.

Commissioner's Disciplinary Recommendation Concurred in by Committee on Professional Responsibility
The Commissioner acknowledged that the record is strongly suggestive that the respondent has overcome the disease which he maintains is a major cause of his criminal offenses. The Commissioner noted, however, that respondent's structured environment in prison and halfway house had not permitted him to demonstrate his ability to cope with his compulsion to gamble without restraining circumstances. Accordingly, the Commissioner recommended that, in order to test respondent's recovery, he should be suspended from the practice of law for a period of twenty-four months commencing with the date of his release from the halfway house in March of 1981.
The Committee on Professional Responsibility concurred in the Commissioner's recommendation that respondent be suspended from the practice of law for an additional two years.
The respondent argues that the evidence presents sufficient proof of punishment and rehabilitation to justify immediate reinstatement or, in the alternative, an additional suspension of no more than one year.

Disciplinary Action
The purpose of lawyer disciplinary proceedings is to maintain appropriate standards of professional conduct in order to protect the public and the administration of justice from lawyers who have demonstrated in their conduct that they are unable or likely to be unable to discharge their professional duties. Louisiana State Bar Ass'n v. Levy, 400 So.2d 1355 (La.1981), No. 60,464; Louisiana State Bar Ass'n v. Quaid, 368 So.2d 1043 (La.1979); Louisiana State Bar Ass'n v. McSween, 347 So.2d 1118 (La.1977); Louisiana State Bar Ass'n v. Ponder, 340 So.2d 134 (La.1976), appeal dismissed 431 U.S. 934, 97 S.Ct. 2643, 53 L.Ed.2d 251; *829 ABA Joint Committee on Professional Discipline, Standards for Lawyer Discipline and Disability Proceedings, § 1.1, p. 1 (Approved Draft February, 1979). The discipline to be imposed in a particular case will depend upon the seriousness and circumstances of the offense, fashioned in light of the purpose of lawyer discipline, taking into account aggravating and mitigating circumstances. Louisiana State Bar Ass'n v. Bensabat, 378 So.2d 380 (La.1979); see ABA Joint Committee on Professional Discipline, Standards for Lawyer Discipline and Disability Proceedings, § 7.1, p. 44 (Approved Draft February, 1979).
Applying these precepts, we conclude that the two-year suspension recommended by the Commissioner and the Committee on Professional Responsibility is warranted. The respondent was convicted of two felonies involving deceit and dishonesty. His criminal conduct violated the Code of Professional Responsibility. See DR1-102, § A(3) and (4). Although such crimes may require more severe discipline under other circumstances, the substantial mitigating circumstances of respondent's case convince us that disbarment or a longer suspension is not appropriate. Nevertheless, even though respondent seems a good candidate for rehabilitation and his crimes were precipitated by addiction and unrelated to his practice, the reasoning of the Commissioner that respondent should be required to prove himself in an unstructured environment is persuasive. Considering that disciplinary action serves to protect the public and the bar from the actions of attorneys who have demonstrated professional irresponsibility, it is appropriate that respondent be required to prove during a two-year period in an unstructured environment that he can overcome his addiction and therefore be trusted with that responsibility again.

Decree
Respondent is suspended from the practice of law for two years commencing with his release from the halfway house in March, 1981. Costs of these proceedings are assessed to respondent.
SUSPENSION ORDERED.
BLANCHE, J., dissents and assigns reasons.
BLANCHE, Justice (dissenting).
This writer is of the opinion that respondent's crimes in no way involved the attorney-client relationship, that reports concerning respondent's rehabilitation are exemplary and further, considering respondent's age, this writer would not impose a restriction of more than one year.