DISCIPLINARY PROCEEDING
WATSON, Justice.
In this disciplinary proceeding by the Louisiana State Bar Association against attorney John Francis Meyer, the Supreme Court of Louisiana has original jurisdiction. LSA-Const.1974, Art. V, § 5(B).[1]
. On April 27, 1983, Meyer was convicted by a jury on five counts of false statements to a federally insured bank in violation of 18 U.S.C. § 1014[2] and sentenced to concurrent sentences of eight months.[3] Meyer was later convicted by the United States District Court for the Eastern District of Louisiana on six counts of defrauding the United States in connection with various postal money orders in violation of 18 U.S.C. §§ 2 and 500.[4] He was sentenced to concurrent sentences of one year on each count, together with a $2,500 fine as to count one on September 21, 1983.
After the false bank statements convictions,[5] and the money order convictions were affirmed,[6] Meyer served his sentences in the United States Federal Penitentiary at Fort Worth, Texas, from May 1, 1984 to February 1, 1985.
Because Meyer stood convicted of serious crimes, an interim suspension of his license to practice law was ordered on February 2, 1984, 444 So.2d 1207. After a hearing, the Louisiana State Bar Association, through its Committee on Professional Responsibility, petitioned for further disciplinary action and Commissioner Charles A. Boggs was appointed to take evidence.
*1212 After graduation from law school and admission to practice in 1945, Meyer practiced law for over thirty-eight years in the City of New Orleans, until his interim suspension. At the time of the commissioner’s hearing, on April 10, 1985, he was sixty-three years old.
Meyer’s health problems include severe heart attacks in 1967 and 1974, and a quadruple bypass operation in 1982. As a result of his heart condition, Meyer can perform only very light manual labor.
The question of Meyer’s guilt is not at issue, being foreclosed by the final convictions. Louisiana State Bar Ass’n v. Marcal, 430 So.2d 47 (La., 1983); Louisiana State Bar Ass’n v. Loridans, 338 So.2d 1338 (La., 1976); Louisiana State Bar Ass’n v. Vesich, 476 So.2d 811 (La., 1985). Evidence about any lack of criminal intent is thus inadmissible. Louisiana State Bar Ass’n v. Pitard, 462 So.2d 178 (La., 1985).[7] However, the facts and circumstances underlying the convictions are relevant to the appropriate sanction to be imposed. Louisiana State Bar Ass’n v. Frank, 472 So.2d 1 (La., 1985); Louisiana State Bar Ass’n v. Vesich, supra.
At three commissioner’s hearings, Meyer, together with his friends and relatives, presented ex parte testimony in mitigation of his actions. He asserted that he was attempting to make partial restitution to the banks. Meyer explained the circumstances surrounding the receipt and use of the postal money orders.[8] His relatives contended that his financial difficulties stemmed, in part, from ill health, the escalation of the prime rate in 1981, and the demands of his wife, who has filed for a divorce.[9]
*1213 It is undisputed that Meyer was convicted of a purely personal breach. His misconduct was not connected with the practice of law; there was no attorney-client relationship and no expectation of a fee. No client’s funds were comingled; no client suffered a financial loss. Louisiana State Bar Ass’n v. Porobil, 444 So.2d 613 (La., 1984); Louisiana State Bar Ass’n v. Vesich, supra.
In Porobil, defendant was convicted as accessory after the fact in giving a false financial statement to a bank. In mitigation it was noted that Porobil concealed the inaccuracy on behalf of a family member, not a legal client; that Porobil did not personally benefit; that the loans were not in default, that Porobil was financially capable and willing to repay the loan, if necessary; that the prison term was suspended; and that respondent had complied with the terms of his probation. It was also noted that there were no previous complaints during Porobil’s ten years in the profession. Porobil was issued an official public reprimand for his conduct.
Meyer’s prior record, though not entirely unblemished, contains only two prior public reprimands. A past clear record is a strong mitigating factor. Louisiana State Bar Ass’n v. Larre’, 457 So.2d 649 (La., 1984); Louisiana State Bar Ass’n v. Porobil, supra; Louisiana State Bar Ass’n v. Perez, 471 So.2d 685 (La., 1985); Louisiana State Bar Ass’n v. Vesich, supra.
The minimal term of imprisonment which both trial judges deemed appropriate for the offense is a mitigating factor favoring Meyer, together with the fact that he was released after serving only eight months. Louisiana State Bar Ass’n v. Weinstein, 416 So.2d 62 (La., 1982).
Attorney discipline maintains standards of professional conduct for the protection of the courts and the public. Louisiana State Bar Ass’n v. Heymann, 405 So.2d 826 (La., 1981); Louisiana State Bar Ass’n v. Ponder, 340 So.2d 134 (La., 1976), appeal dismissed 431 U.S. 934, 97 S.Ct. 2643, 53 L.Ed.2d 251 (1977). That purpose is not served by imposing a greater sanction than is warranted by the circumstances. Louisiana State Bar Ass’n v. Porobil, supra; Louisiana State Bar Ass’n v. Vesich, supra. The discipline to be imposed in a particular case depends upon the seriousness of the offense, considered in light of all of the aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Weinstein, supra; Louisiana State Bar Ass’n v. Bensabat, 378 So.2d 380 (La., 1979).
Meyer’s crimes must be weighed against his past record, his medical and marital problems, the restitution made, and his contrition. The crimes warrant discipline. The commissioner who heard the evidence recommended suspension from the practice of law for a period of two and one-half years from the date of interim suspension, or until August 2,1986. The Committee on Professional Responsibility, composed of Meyer’s peers, filed a concurrence to the commissioner’s report. The support of other attorneys in asking for a merciful disposition may appropriately be considered in deciding the sanction for Meyer’s conduct. Louisiana State Bar Ass’n v. Weinstein, supra; Louisiana State Bar Ass’n v. Perez, supra. In this instance, some financial loss was incurred by several of the financial institutions. Without the strong confidence shown in Meyer by other members of the bar, a more severe sanction would be ordered. However, considering all the circumstances, the recommendation of the Commissioner and the Committee is appropriate.
IT IS THEREFORE ORDERED that John Francis Meyer be suspended from practicing law in the State of Louisiana for a period of two and one-half years, commencing February 2, 1984. All costs of these proceedings are taxed against respondent Meyer.

. LSA-Const.1974, Art. V, § 5(B) provides:
"Original Jurisdiction. The supreme court has exclusive original jurisdiction of disciplinary proceedings against a member of the bar.”

. Unreported. April 27, 1983, Criminal Docket No. 82-391, United States District Court for the Eastern District of Louisiana.

. The prison sentence was suspended on Count Five and Meyer was placed on active probation for a period of three years after his release from confinement.

. Unreported. September 21, 1983, Criminal Docket No. 83-258, United States District Court for the Eastern District of Louisiana.

. United States v. Meyer, 717 F.2d 1398 (5th Cir., 1983) [without published opinion].

. United States v. Meyer, 733 F.2d 362 (5th Cir., 1984).

. The jury and the trial judge ruled unfavorably to Meyer in weighing his story surrounding the circumstances of the pledge of "SheU" stock to the banks. Shell Refinery, Inc., stock proved to be valueless at trial, and to have no connection with Shell Oil. Further, certificates of Shell Oil proved to be counterfeit at trial. Meyer alleged he had purchased all the shares for value many years ago, from two different persons now deceased; that he had previously used them for collateral with one of the banks involved in the current action in a loan around 1968 to 1971, which he had repaid, and had no knowledge of their worthlessness. Further he had repaid $20,000 to one of the banks involved around 1981 or 1982. (It is not clear whether this repayment came in part from new loans from one of the other banks, or from fire insurance proceeds.)

. Meyer’s civil and criminal practice was such that many of his clients paid small amounts on account by money order. He frequently found envelopes containing money orders slipped under the door of his office, particularly during the lunch hour. The trial judge disbelieved Meyer’s story that these six money orders, in envelopes from three named clients, filled out in amount only, were slipped under the door during lunch, in December, 1981. Meyer used them to pay several personal bills. He disclaimed knowledge that they were stolen. Upon later learning of the theft, he immediately made restitution to all payees but one, and tendered restitution to the other. The employees of this department store refused to accept the tender, as the store had subsequently been bought out by another store, and they did not know how to enter the payment into their accounting system. An either unfortunate or fortuitous fire a few weeks later, in early January, 1982, destroyed Meyer’s rented premises. All of his law books, furniture and equipment, and most of his files were destroyed, including those of the clients who made the alleged remittances by money orders. During the time of this incident, Meyer’s secretary of eleven years was living with a man who was subsequently convicted of the original robbery in which the money orders had been stolen in South Carolina. Both of them refused to come forward and give any testimony as to how Meyer came into possession of the money orders. Although Meyer has not seen his secretary, he has seen a letter in which she allegedly received payment of $750 for her aid in convicting an unnamed person connected with the theft. Meyer explains the three clients' denial of paying him with money orders by wryly noting that, after the fire, all of his current clients emphatically denied that they owed him any money on account. He has been unable to collect any of these receivables. The insurance proceeds from the fire, some $30,000, were used to pay the cost of his quadruple bypass operation and some bills. His two previous heart attacks made him uninsurable.

.His marriage was allegedly fraught with strife; she was much younger and stronger than he, had a quarrelsome and violent nature, and had on numerous occasions driven him from the house between 2:00 and 5:00 A.M., at which time he sought refuge with his sister and her husband. The wife had been committed several times to Mandeville for her emotional/mental instability. A short time after coercing him into signing over half ownership in some of his sepa *1213 rately owned property, including his home, and buying her a new car (At the time, she did not know how to drive.), she filed for divorce.