IN THE MATTER OF JOHN A. ESPOSITO, AN ATTORNEY AT LAW.

May 8, 1984.

## ORDER

The Disciplinary Review Board having filed a recommendation with the Supreme Court recommending that JOHN A. ESPOSITO of UNION CITY be suspended from the practice of law for six months based upon respondent's guilty plea to a violation of 26 *U.S.C.A.* 7203, and good cause appearing;

It is ORDERED that the report of the Disciplinary Review Board is hereby adopted and that JOHN A. ESPOSITO is suspended from the practice of law for a period of six months, effective May 28, 1984, and until further order of this Court; and it is further

ORDERED that JOHN A. ESPOSITO be and hereby is restrained and enjoined from practicing law during the period of his suspension, and it is further

ORDERED that JOHN A. ESPOSITO reimburse the Office of Attorney Ethics for appropriate administrative costs; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.

### Decision and Recommendation of the Disciplinary Review Board

This matter is before the Board based on a three-count presentment filed by the District VI Ethics Committee for Hudson County. The presentment charges the respondent with various disciplinary violations in his representation of particular clients, as well as in connection with his guilty plea to criminal charges for failing to pay federal income and social security

taxes on behalf of his employees. A fourth complaint, filed by the District IV Ethics Committee and consolidating the above matters, was dismissed by the Hearing Panel. The charges of misconduct may be summarized as follows:

### I. *Powers Complaint* (VI–79–13E)

In January 1967, complainants Joseph and Justine Powers consulted respondent about assisting them in the processing of an adoption. The complainants were initially approached about the adoption by Dr. Cacace who, as the Powers' personal physician, was aware that they were unable to have children. Dr. Cacace was then also treating a pregnant 14 year old girl who was willing to surrender her unborn child. Dr. Cacace informed complainants of this and referred them to respondent.

In January 1967, complainants received a telephone call from Dr. Cacace. He told them that a child had been born and that they could come to the hospital to get her. Joseph Powers, accompanied by his sister-in-law, a nurse, went to the hospital and surreptitiously received the baby. Mr. Powers never met the natural mother nor did he determine whether she consented to the adoption.

Shortly after the baby was delivered to complainants, they met with respondent to commence adoption proceedings. At this meeting, respondent discussed the necessity of obtaining the natural mother's consent to the adoption. He also had complainants complete some forms which were to be filed with the proper court. Complainants claimed that they then paid respondent a $200 retainer, which he denied having received and for which no proof of payment was produced.

Subsequent to this meeting and periodically over the next 12 years, complainants would telephone respondent to determine the progress of the adoption. These calls would usually coincide with a period in the child's life when proof of the child's adoption status was in question, such as registration for school. On two or three occasions during this period, complainants

went to respondent's office to discuss the adoption. Each time they were asked to sign papers after being told that the papers they had previously signed had been lost.

Respondent testified that during each of these intermittent conversations or meetings he advised complainants that the circumstances surrounding their acquisition of the child were irregular and that they should contact either a state agency or Catholic Charities to arrange for a proper placement. Complainants denied having any such discussions with respondent. They did acknowledge, however, that respondent twice helped them to prepare income tax returns. According to respondent, complainants sought his advice concerning the permissibility of deducting the expenses of the child as a dependent. He advised them that they would probably not be able to take the deduction unless the child was adopted through a proper proceeding. Whenever he raised this issue, though, complainants expressed concern that the child would be taken from them by the adoptive agency.

Finally, in March 1979, complainants wrote to the Assignment Judge of Hudson County, requesting his help in the adoption of their child who was then 12 years old. The Assignment Judge forwarded this letter to the Ethics Committee. Shortly thereafter, respondent prepared a complaint for adoption, which he attempted to file with the Hudson County Surrogate. The Surrogate's office refused to file the complaint citing the unusual circumstances surrounding complainants' receipt of the child. Respondent then contacted complainants and explained the problem to them. He prepared an affidavit which they signed reciting the facts of the delivery of the child to them. The affidavit was not filed with the Surrogate. This meeting was the last contact between complainants and respondent. Subsequently, another attorney successfully completed the adoption proceeding when the child was 16 years old.

At the hearing before the District VI Ethics Committee, the testimony of complainants and respondent conflicted markedly.

While respondent acknowledged that he had met complainants and had spoken to them a number of times over the 12-year period, he emphasized that in each of their discussions he raised the problem that the adoption faced because of the natural mother's lack of consent. Complainants denied ever having such discussions with respondent, claiming that he repeatedly assured them that the adoption was proceeding. When questioned why they waited 12 years to finally resolve this matter, complainants testified that it was because they believed respondent was working on their problem for them. Respondent testified, however, that whenever complainants were apprised of the difficulties that the adoption faced, they were so fearful of losing the child to a placement agency that they failed to pursue the matter further.

The District VI Hearing Panel resolved the factual dispute in favor of complainants. The panel specifically found that respondent violated *DR* 1–102(A)(1), (4) and (6); *DR* 6–101(A)(1); *DR* 7–101(A)(1), (2) and (3).

## II. *Madia Complaint* (VI–81–78E)

Complainant Nino Madia was an employee and minor shareholder of Rock Furniture Company, which operated a retail furniture store near respondent's office. On December 10, 1980, complainant was served with a summons and complaint in a Superior Court action demanding return of a $3,000 deposit placed on furniture to be purchased from complainant's store. The complaint named both the corporation and complainant personally as defendants.

Complainant went to respondent to discuss the filing of an answer on behalf of complainant personally. Respondent reviewed the complaint and recognized that it alleged a consumer fraud, potentially subjecting complainant to treble damages. Respondent advised complainant of this fact. At the request of Madia, respondent then offered to make a courtesy call to the plaintiffs' attorney to see if a settlement between the parties

could be arranged. Complainant agreed to the offer and respondent immediately called plaintiffs' counsel. A settlement, however, could not be reached.

After the telephone conversation, respondent testified that he told complainant that the complaint had to be answered within 20 days and that he would have to receive a $350 retainer if complainant wished to retain him. At that point, according to respondent, complainant informed him that his corporation, Rock Furniture Company, was going bankrupt. Respondent suggested that complainant might use the corporation's bankruptcy attorney to represent him personally especially since a $5,000 retainer had apparently been paid. Respondent then returned the summons and complaint to complainant and told him that if he wished to retain respondent, he would have to first pay the $350 retainer. Respondent called complainant shortly thereafter to ask whether he was being retained. Complainant promised to "get back to" respondent, but never did so.

Respondent heard nothing further from complainant until February 1981 when the latter was served with a levy by a deputy sheriff who informed him that a judgment had been entered against him in the civil action. According to complainant, this was the first time he learned that respondent had not represented him by filing an answer or otherwise defending on the suit. In his testimony before the District Ethics Committee, complainant stated that after respondent unsuccessfully attempted to settle the matter over the telephone with the plaintiffs' attorney, that respondent said he would file an answer on complainant's behalf. Respondent did not ask for a retainer at this time, though complainant claimed to have offered him a fee. According to complainant, respondent said that he would stop by complainant's store and drop off his bill. Respondent, however, never did this.

After being served with the levy, complainant attempted to communicate with respondent by telephone, but was unable to

reach him. Respondent stated that he was unaware of any such attempts being made and that he had specifically told the deputy sheriff who called him in connection with the levy that he did not, and had not, represented complainant.

Complainant subsequently retained other counsel in an attempt to have the judgment vacated. The attempt was unsuccessful. Complainant then appealed to the Appellate Division which upheld the denial of the motion to vacate.

The Hearing Panel of the District VI Ethics Committee determined that complainant was a client of respondent and that respondent had undertaken the obligation to defend him. The Panel accordingly found respondent guilty of violating *DR* 1–102(A)(5) and (6); *DR* 6–101(A)(1); *DR* 7–101(A)(2) and (3).

### III. *Committee Complaint* (VI–82–32E)

In a criminal action brought by the United States Attorney's Office, respondent was charged with a ten-count violation of 26 *U.S.C.* 7203 for his failure to pay income and Social Security taxes on behalf of his employees and Social Security taxes on behalf of the employer. The ten counts each covered a calendar quarter from July 1, 1976 through December 31, 1978 during which these taxes were not paid nor tax returns filed. After a plea bargain with the United States Attorney's office, respondent pled guilty to a violation of the statute for one of the quarters. He received a probationary sentence of one year and a $5,000 fine.

The District Ethics Committee filed a complaint against respondent based on his guilty plea. A hearing was held solely to consider the issue of mitigation since the plea was conclusive evidence of respondent's unethical conduct. The Committee heard testimony from respondent and his secretary, Ms. Dixie Angulo, both of whom stated that for a period of 18 months during 1976 and 1977, respondent's mother, with whom he lived, suffered a stroke from which she eventually died. Respondent was her only child. During this period, respondent

visited her constantly in the hospital (three to four times daily) and subsequently at a nursing home.

The period during which respondent's mother was ill coincided with some of the quarters during which his employees' and employer's taxes were not paid. The Committee recognized that the pressure of his mother's illness, coupled with those attendent on his law practice, may have led respondent to neglect some of his other obligations. The testimony of Ms Angulo, however, revealed that she prepared the tax forms for respondent's signature and that he failed to perform the simple ministerial duties of checking and signing the forms and mailing them. Consequently, the Committee held that the length of time respondent failed to pay the taxes, coupled with the ease with which the returns could have been filed, belied any mitigating circumstances respondent offered. The Committee was also unpersuaded by the fact that the unpaid taxes remained in respondent's business account throughout the ten quarters. The Committee, accordingly, found respondent guilty of violating *DR* 1–102(A)(3) and (6).

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the Committee, in finding respondent guilty of unethical conduct for his failure to pay his employees' income and social security taxes is fully supported by clear and convincing evidence. However, the Board does not find that this burden of proof has been sustained in either the *Powers* or *Madia* complaints and votes to dismiss both of these matters.

The Board's determination in *Powers* is predicated on the view that the primary concern of complainants was to retain custody of the child so as to make them unwilling to undertake any action which might jeopardize this relationship. Despite the conflict in testimony as to whether respondent advised complainants of the difficulties that this particular adoption faced, complainants did discuss the status of the adoption with

respondent on numerous occasions. It seems unlikely that respondent would not have raised some of these difficulties with them. This is borne out by complainants seeking respondent's advice concerning the possibility of their deducting the child's support on their income tax. Respondent told them they could not do this without legally adopting the child and that the adoption could not occur without first obtaining the natural mother's consent or placing the child with a state or private adoption agency. The mother's consent was unavailable despite respondent's best efforts to obtain it, and the complainants' refused to deliver the child to any agency for fear she would be placed with another family. Indeed, after their initial consultation with respondent, complainants spoke with respondent only when they sought to benefit from providing the child's care (income tax deduction), or where the adoptive status of the child was in question (registration for school). Complainants' communication with respondent at all other times was minimal or nonexistent.

In reaching its conclusion, the Board rejects the Committee's finding that respondent advised complainants about the adoption proceedings prior to the birth of the child. The testimony of both complainant's husband and respondent was that respondent was first consulted a few months after complainants received the baby surreptitiously at the hospital. Thus, respondent could not have advised complainants of the permissibility of their receipt of the child. Moreover, respondent's repeated attempts to obtain the natural mother's consent through Dr. Cacace indicates his own reservations about the legality of the child's transfer.

Whatever lack of diligence respondent displayed by failing to complete the adoption was motivated primarily by complainants' desire not to have the child taken from them. The evidence does not clearly and convincingly establish that respondent violated any disciplinary rule in acceding to his clients' wishes.

A similar result is mandated in the *Madia* matter. Here, complainant was a businessman who sought respondent's advice upon receipt of a summons and complaint in a civil action. Respondent had never met complainant prior to his bringing in the summons and complaint and had no communication with him after this initial meeting, except for a few brief telephone conversations to determine whether complainant wanted to retain him. No retainer was ever paid.

The sole evidence against respondent was a telephone call respondent made to an attorney (Avery) representing the plaintiffs against Mr. Madia. The call was made at complainant's request to see whether a settlement could be reached. Respondent characterized the effort as a courtesy call done as a favor to complainant.

There is a conflict of testimony as to whether respondent returned the summons and complaint to complainant. Respondent said he did so after complainant informed him that the corporation of which complainant was a shareholder was filing for bankruptcy and that the bankruptcy attorney had already been paid a retainer. Respondent suggested that this attorney should also handle the action against complainant. Complainant claims that he left the summons and complaint with respondent, who promised to file an answer on his behalf. The first time complainant learned this had not been done was when he was served with a levy by the sheriff.

The District Ethics Committee accepted complainant's version of the facts. The Board is skeptical of this finding since complainant was a sophisticated businessman who had had considerable prior dealings with attorneys. At the time he met with respondent, he already had another attorney on retainer.

Respondent's brief conversation with plaintiffs' counsel Avery in an effort to settle the civil action is not dispositive of respondent's acceptance of complainant as a client. Respondent told complainant that he would require a $350 retainer before filing an answer, but that he would see if he could settle

the matter while complainant was with him in the office. That respondent was not representing complainant was certainly understood by the plaintiffs' attorney since Mr. Avery dealt directly with complainant during discovery proceedings.

These factors cast doubt upon the Committee's findings and lead the Board to conclude that the proof of unethical conduct against respondent in the *Madia* matter does not rise to the level of clear and convincing evidence.

Finally there is the Committee complaint based on respondent's guilty plea to a single violation of 26 *U.S.C.* 7203. Respondent's plea is conclusive evidence of his guilt in this proceeding. *In re Mirabelli,* 79 *N.J.* 597 (1979).

Unlike cases in which respondents have been disciplined for failing to pay income tax, *In re Hyra,* 72 *N.J.* 641 (1977), respondent's conduct here is not marked by any attempt at personal gain. The undisputed testimony reveals that the funds due to the Internal Revenue Service were at all times available in respondent's business account. There is also evidence that respondent was under severe emotional stress during much of the period that the taxes remained unpaid due to his mother's lengthy illness and consequent death.

Taking these factors into consideration, the Board recommends that respondent be suspended from the practice of law for a period of six months. *In re Hughes,* 69 *N.J.* 116 (1976). The Board further recommends that respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.