553 So.2d 448 (1989)
LOUISIANA STATE BAR ASSOCIATION
v.
Joseph B. AMBERG Jr.
No. 87-B-1546.
Supreme Court of Louisiana.
December 11, 1989.
Rehearing Denied February 22, 1990.
Thomas O. Collings, Jr., Anne LaCour Neeb, New Orleans, Gerard F. Thomas, Natchitoches, Roland J. Achee, Shreveport, Robert J. Boudreau, Lake Charles, Robert M. Contois, New Orleans, Frank J. Gremillion, Baton Rouge, Carrick R. Inabnett, Monroe, Harvey Lewis, New Orleans, Alfred S. Landry, New Iberia, Philippi P. St. Pé, Trevor G. Bryan, Elizabeth A. Alston, New Orleans, Christine Lipsey, Baton Rouge, Edmund McCollam, Houma, for applicant.
Joseph B. Amberg, Jr., Kenner, for respondent.
DENNIS, Justice.
This is an attorney disciplinary proceeding. The Committee on Professional Responsibility of the Louisiana State Bar Association has petitioned this court to suspend the respondent, Joseph B. Amberg, Jr., from the practice of law for a period of three years.

Facts
This court finds that the facts, as set forth by the findings of the Commissioner, Edward P. Lobman, have been proven by clear and convincing evidence.
As a result of an automobile accident that occurred on December 19, 1980, Ms. Adelaide F. McKee retained Joseph B. Amberg, Jr., attorney at law, to represent her. A civil lawsuit was filed by Mr. Amberg on Ms. McKee's behalf on December 21, 1981.
During the course of the litigation Mr. Amberg learned that Claver Federal Credit Union held a chattel mortgage on Ms. McKee's vehicle, which was demolished in the December 19, 1980 accident. Mr. Amberg, on behalf of Ms. McKee, and Elmer Gibbons, attorney for Claver Federal Credit Union, entered into an agreement pursuant to which Ms. McKee agreed to assign her interest in the lawsuit filed by Mr. Amberg on her behalf to Claver Federal, which assignment was drafted by Mr. Gibbons, forwarded to Mr. Amberg on October 5, 1982, and filed of record on November 9, 1983. It was understood that Claver Federal *449 Credit Union would receive whatever amount was recovered by Ms. McKee at the conclusion of the litigation to reimburse Claver Federal part, if not all, of the money the credit union was owed on the car.
Ms. McKee's lawsuit was settled in December of 1983 for $2,000.00. After Mr. Amberg's office received the settlement draft from Travelers Insurance Company, Ms. McKee was contacted and asked to come to Mr. Amberg's office to endorse the draft so that it could be deposited. Mr. Amberg deposited the $2,000.00 Travelers draft with several other checks or drafts on December 12, 1983, into an account entitled "Amberg and Associates Limited, A Professional Law Corporation, Trust Account," number 14000650 at the First National Bank of Jefferson Parish. Ms. McKee understood that the net proceeds of the settlement, $925.50, would be sent directly to Claver Federal and that Mr. Amberg would negotiate a payment plan with Claver Federal for Ms. McKee to pay the remaining balance on her loan.
On January 16, 1984, Mr. Gibbons spoke with Mr. Amberg, at which time Mr. Amberg indicated that he was sending the money to the credit union. Having not received the funds by February 24, 1984, Mr. Gibbons wrote Mr. Amberg requesting transmission of the funds. Receiving no response, Mr. Gibbons wrote Mr. Amberg again on March 16, 1984, advising that he was proceeding with the lawsuit against Ms. McKee, and would proceed to obtain a judgment against her.
A default judgment was obtained on June 14, 1984, in favor of Claver Federal and against Ms. McKee in the amount of $4,489.87 plus interest, costs, and attorney's fees. On August 14, 1984, Claver Federal filed a Motion to Examine Judgment Debtor which was served on Ms. McKee on August 15, 1984. This proceeding was Ms. McKee's first notice that Claver Federal had not received her share of the prior settlement, and that Mr. Amberg had failed to arrange a mutually acceptable payment plan for the remaining debt.
On September 17, 1984, Ms. McKee filed a complaint with the Louisiana State Bar Association. Mr. Amberg was contacted by the Bar Association in regard to Ms. McKee's complaint in September of 1984. On March 7, 1985, Mr. Gibbons received a check from Mr. Amberg in the amount of $925.50, representing Ms. McKee's net proceeds from the settlement that was effected in December of 1983.
At various times between December 12, 1983, the date the Travelers settlement draft was deposited into Mr. Amberg's account, and March 7, 1985, the date Mr. Gibbons received Mr. Amberg's check pursuant to the assignment, the balance in Mr. Amberg's account dropped below $925.50, and reached its lowest level of $30.00 in December, 1984.

Breaches
In his testimony in his defense, Amberg admitted that his neglect had contributed to his client's being deprived of the benefit of her money for over one year, but he claimed that he had been prevented from delivering the funds initially by the acts of third persons. He conceded that no attempt had been made to transfer Ms. McKee's net settlement proceeds to her creditor at the time of settlement, but he contended that this failure was due to the defalcation of his former paralegal-secretary whose whereabouts were unknown. Although he did not dispute that he had received notification of his former employee's failure to deliver Ms. McKee's funds about one month after the settlement, he testified that he was powerless to repair the damage for over twelve months because of a combination of circumstances including a separation from his wife, her attempted suicide, and his careless handling and storage of clients' files during the relocation of his law office.
Although the Committee did not establish with clear and convincing evidence that Amberg knowingly converted his client's money for his own benefit, it is highly improbable that the lengthy deprivation could have occurred without gross negligence on his part. The combination of circumstances described by Amberg is unlikely, and he offered no evidence of the events other than his own testimony. *450 Even if we accept his uncorroborated account of his secretary-paralegal's defalcation and his misplacement of his client's file, this does not explain his prolonged failure to rectify his default in duty to his client. He was put on notice of his former employee's alleged embezzlement and failure to disburse Ms. McKee's funds a few weeks after the settlement. Despite the loss of the client's file, he easily could have determined what happened by reviewing his records with his bank. If Amberg had sufficient funds on hand at this time, as he contended, he could have paid her creditor the money due shortly after being notified of the default.
In an effort to convince this Court that he did not receive any benefit from the misapplication of Ms. McKee's funds or the delay in disbursing them, Amberg added a further set of implausible facts to his testimony. He contended that the shortage in his account reflected by the bank records was not due to a true insufficiency but was caused by the bank's failure to comply with an agreement he had made with one of its former officers. (Amberg did not call the former officer as a witness; nor could Amberg recall his last name.) Under the agreement, he testified, insurance company drafts were to be credited to his account immediately upon deposit, instead of after they had cleared as in normal banking practice. Amberg explained that the former officer agreed to give him special treatment because he had, on deposit, some $90,000.00 in his mother's name and back-up money of his own. Because the bank failed to follow the procedure agreed upon during the period of Ms. McKee's deprivation of funds, he testified, there were unjustified shortages in his account.
Amberg presented no evidence to corroborate his testimony as to the agreement with the bank or the $90,000.00 deposit. He testified that he had discussed the matter with a present bank officer who could substantiate his story, but he failed to produce the witness or to request a recess for that purpose. In the absence of corroboration of at least some of the circumstances of the banking arrangement, which should have been easy to obtain, we conclude that Amberg's testimony in this regard is implausible.
The Committee's petition charges that Amberg committed disciplinary rule violations by permitting his client's funds to be improperly withdrawn, commingled and converted to his own use, DR 9-102(A) & (B), by failing to properly account to his client, DR 9-102(B)(1)-(4), and by neglecting matters his client had entrusted to his care. DR 6-101(A)(3). In its brief, the Committee does not contend that Amberg knowingly or fraudulently converted the client's funds to his use, but that the respondent was guilty of gross negligence in causing injury to the client from which he benefitted. We conclude that the Committee has proved the violations of gross negligence, as contended, by clear and convincing evidence.

Sanction
The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to properly discharge their professional duties to clients, the public, the legal system, and the legal profession. ABA Standards for Imposing Lawyer Sanctions, Standard 1.1. See also Louisiana State Bar Ass'n v. Dumaine, 550 So.2d 1197 (La.1989); Louisiana State Bar Ass'n v. Williams, 498 So.2d 727 (La.1986); Louisiana State Bar Ass'n v. Drury, 455 So.2d 1387 (La. 1984); Louisiana State Bar Ass'n v. Hopkins, 447 So.2d 464 (La.1984); Louisiana State Bar Ass'n v. O'Halloran, 412 So.2d 523 (La.1982).
The lawyer's duty to preserve his client's property should be one of his most deeply felt obligations, since it corresponds to his client's just claim to the attorney's loyal, diligent service. See Introduction, Standard 4.0. Aside from life and liberty, a client can entrust no more cherished right to a lawyer's defense than his right to property. Consequently, there are few more egregious acts of professional misconduct of which an attorney can be guilty than the misappropriation of a client's funds held in trust. See Commentary, *451 Standard 4.1; Louisiana State Bar Ass'n v. Scariano, 523 So.2d 834 (La.1988); Louisiana State Bar Ass'n v. Elbert, 512 So.2d 398 (La. 1987); Louisiana State Bar Ass'n v. Krasnoff, 502 So.2d 1018 (La.1987); Louisiana State Bar Ass'n v. Alker, 491 So.2d 1328 (La.1986) Louisiana State Bar Ass'n v. Zeringer, 447 So.2d 466 (La. 1984); Louisiana State Bar Ass'n v. Powell, 439 So.2d 415 (La.1983); In re Wilson, 81 N.J. 451, 409 A.2d 1153 (1979).
In establishing several levels of sanctions, ranging in severity from disbarment to admonition, the ABA Standards for Imposing Lawyer Sanctions take into account both the quality of the errant lawyer's disloyalty and the gravity of the harm or danger to the client's interest caused by his misconduct. The black letter rules provide simply that, if the attorney's misconduct causes injury or potential injury to a client, disbarment is generally appropriate when a lawyer knowingly converts client property, Standard 4.11; suspension is usually called for when a lawyer knows or should know that he is dealing improperly with client property, Standard 4.12; and reprimand is generally appropriate when a lawyer is negligent in dealing with client property. Standard 4.13. The minimum sanction of admonition should be reserved for cases in which the lawyer's slight or ordinary negligence poses little or no risk of injury to the client. Standard 4.14.
Considering the Standards as a whole and in light of the commentaries accompanying them, it is evident that the degree of the errant lawyer's blameworthiness and the magnitude of the client's harm should be considered in tandem as flexible and dynamic elements influencing the level of sanction to be chosen. See Standards 3.0, 4.11-4.13 and Commentaries thereunder. Disbarment is recognized as being required when a lawyer has knowingly converted his client's funds, used them for his own benefit, and injured the client in the process. See Commentary, Standard 4.11. Disbarment may also apply in case of such a conversion even if there has been no injury to the client, because this type of misconduct creates a clear potential for injury and indicates that the attorney is not morally fit to practice law. See Commentary, Standard 4.11. Suspension or disbarment may be imposed when a lawyer causes his client injury by gross negligence, rather than knowing conversion, in dealing with client funds. See Commentary, Standard 4.13. On the other hand, reprimand should be reserved for lawyers who cause injury or potential injury to a client through slight or ordinary negligence. See Commentary, Standard 4.13. For example, lawyers who are grossly negligent in failing to establish proper accounting procedures should be suspended; reprimand may be appropriate for lawyers who simply are negligent in failing to follow their established procedures or who are negligent in training or supervising employees in handling client funds. See Commentary, Standard 4.13.
Applying the Standards, a suspension is generally appropriate in the present case, rather than disbarment, reprimand or admonition. Although Amberg's conduct caused serious injury to the client, he did not knowingly or intentionally set out to convert the client's funds to his own use. On the other hand, he was guilty of gross negligence and knew or should have known that he was improperly dealing with client property. A reprimand or lesser sanction is not generally appropriate because Amberg's conduct was much more reprehensible than slight or ordinary negligence.
Under the Standards, the court, after determining the appropriate level of sanction, considers the aggravating and mitigating circumstances in order to further tailor the sanction to the particular offense and the offender. See Standard 9.1.
Aggravation or aggravating circumstances are considerations or factors that may justify an increase of discipline to be imposed. Standard 9.21. In our opinion the gravity of the injury to the client caused by Amberg's misconduct is an aggravating factor in this case. Further, by failing to rectify the error or misdeed of his paralegal-secretary when it came to his attention, Amberg knew or should have known that his client was in a vunerable position and that his conduct aggravated her potential liability to her creditor. See Standard *452 9.22(h). The evidence reflects that this dereliction ultimately cost his client an additional $4,000.00, garnishment of her and her brother's wages, and additional attorney's fees. The record does not show that Amberg has made or is making restitution; on the contrary, it reflects that he is indifferent to making restitution, and that, except for acknowledging some neglect, he has refused to admit the wrongful nature of his conduct. See Standard 9.22(g) and (j). On the whole, we do not find his testimony to be honest and forthcoming but rather contrived and calculated to cover up his gross neglect of his duty to his client. See Standard 9.22(f). Since Amberg has had twenty years of experience in the practice of law, his misconduct must be judged more sternly than if he were a neophyte. See Standard 9.22(i).
Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. Standard 9.31. One mitigating factor is Amberg's lack of a prior disciplinary record. See Standard 9.32. Although he testified to personal problems, this evidence was uncorroborated, and we do not believe his difficulties were so severe or atypical that they may be considered as mitigation. See Standard 9.32(c). Likewise, the delivery of his client's $925.50 to his client's creditor cannot be considered as timely good faith restitution because he paid a year late and only under compulsion of the disciplinary investigation. See Standard 9.32(d). Moreover, he caused the client some $4,000.00 additional damage that he has not even offered to repair. See Standard 9.4(a).
Our impression is that the suspension should be of maximum duration, i.e., three years, Standard 2.3, because the substantial aggravating factors are not offset by any appreciable mitigation. The Committee also recommended a three year suspension.
Our sanction choice of a three year suspension is further confirmed by the precepts developed by this court for imposing sanctions upon attorneys who mishandle client funds in Louisiana State Bar Ass'n v. Hinrichs, 486 So.2d 116 (La.1986), and in other cases cited therein. In Hinrichs we observed that in a case warranting disbarment one or more of the following elements are usually present: the lawyer typically has acted in bad faith and intended a result inconsistent with his client's interest; committed forgery or other fraudulent acts; caused serious damage or potential damage to his client; or has failed to make an effort toward timely voluntary restitution. On the other hand, the Hinrichs court noted that a three year suspension is usually justified when the lawyer is guilty of a high degree of negligence in causing his client's funds to be withdrawn or retained improperly, regardless of whether there was no fraudulent act, whether the client's damage was minimal, or whether full restitution was made. In the present case, although the factors cannot be applied mechanistically, the attorney's lack of intentional conversion, bad faith or fraud persuades us against imposing disbarment, but his gross negligence causing serious injury to his client impels us toward a three year suspension rather than a less severe sanction.
Furthermore, because of the extensive harm done to the client, the attorney's apparent lack of remorse and his failure to make efforts toward complete restitution, we do not believe that he should be reinstated automatically to the practice of law upon the expiration of his suspension. Accordingly, a special condition will be imposed upon his readmission: He must prove to the Committee or other designated representative of the bar association that he is morally fit to practice law and that he has made or is making satisfactory efforts toward reparation of the damage that his misconduct caused his client.

Decree
For the reasons assigned, the attorney is suspended from the practice of law for three years; and his readmission shall be subject to the condition that he prove his moral fitness to practice, make satisfactory reparation of his client's damage, and pay all costs of these proceedings.
*453 ATTORNEY SUSPENDED THREE YEARS; SPECIAL CONDITION IMPOSED ON READMISSION.