562 So.2d 902 (1990)
LOUISIANA STATE BAR ASSOCIATION
v.
Thomas Barry WILKINSON.
No. 89-B-2016.
Supreme Court of Louisiana.
June 4, 1990.
Thomas Collins, Executive Counsel, G. Fred Ours, Asst. Counsel, New Orleans, for Louisiana State Bar Assoc. plaintiff-applicant.
Sam J. D'Amico, Baton Rouge, for T. Barry Wilkinson defendant-respondent.
DENNIS, Justice.[*]
Thomas Barry Wilkinson, the respondent lawyer in this attorney disciplinary proceeding, *903 pleaded guilty in a United States District Court to aiding and abetting wire fraud, 18 U.S.C. §§ 2 and 1343, and was sentenced to one year in prison. He served six months in prison and three months in a halfway house. The Committee on Professional Responsibility of the Louisiana State Bar Association seeks to discipline the respondent because the offense constituted a serious crime reflecting adversely on the attorney's moral fitness to practice law. Articles of the Louisiana State Bar Association, Art. XV, § 8.
Fraud by wire occurs when a person, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice. 18 U.S.C. § 1343. The offense is punishable by a fine of not more than $1,000 or imprisonment of not more than five years, or both. Id. A person who commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal. 18 U.S.C. 2. Wilkinson pleaded guilty on February 8, 1989 to committing wire fraud by knowingly aiding and abetting others in a scheme to obtain loans from a lending institution by means of false pretenses and representations as to the making of down payments and the making of notes payable to the sellers of property purchased by its borrowers, and, in furtherance of the scheme, by transmitting a wire communication in interstate commerce. His plea was entered pursuant to a plea bargain under which he agreed to cooperate with the prosecution and the government agreed to recommend a sentence of no more than two years in prison and a fine of $1,000.

PROCEDURAL HISTORY
Upon learning that Wilkinson had been convicted of a crime, the Committee on Professional Responsibility obtained a copy of the conviction, determined that the offense constituted a serious crime, and filed a report of its findings in this court. In response, this court on September 11, 1989 suspended Wilkinson from the practice of law and ordered the Committee to institute disciplinary proceedings against him. Subsequently, on February 2, 1990, the Committee and Wilkinson jointly moved this court to dispense with the appointment of a commissioner and to allow them to submit the matter for decision based on the Committee's petition and report, including all attachments (consisting of the bill of information for aiding and abetting wire fraud, the plea agreement, the guilty plea proceeding and the sentencing proceeding in the United States District Court), a stipulation of testimony, letters of character attestation, and the written and oral arguments of counsel. This court granted the joint motion and considered the record, briefs and oral arguments.

SANCTION IS THE SOLE ISSUE
In an attorney disciplinary proceeding based on the lawyer's criminal conviction, the issue of his guilt may not be relitigated. Because the lawyer's conviction, whether based on adjudication or guilty plea, is tantamount to a finding of his guilt beyond a reasonable doubt, the clear-and-convincing standard of proof that applies to disciplinary proceedings has already been satisfied. Maryland State Bar Assn. v. Rosenberg, 273 Md. 351, 329 A.2d 106 (1974). Thus, due process does not require a second opportunity for the lawyer to refute the criminal charges. Florida Bar v. Lancaster, 448 So.2d 1019 (Fla. 1984). A criminal conviction, based on either an adjudication or a plea of guilt, is considered to be conclusive proof that the attorney committed the essential elements of the offense. LSBA v. Frank, 472 So.2d 1 (La.1985); LSBA v. Loridans, 338 So.2d 1338 (La.1976); In re Esposito, 96 N.J. 122, 474 A.2d 254 (1984); See Articles of Incorporation, La. State Bar Assn., Art. XV, § 8(a)(7)(d); ABA Model Rules for Lawyer Disciplinary Enforcement, Rule 19(E) (1989). In this type of proceeding the sole *904 issue to be determined is whether the crime warrants discipline and, if so, the extent thereof. Id. A disciplinary proceeding inquires into a lawyer's fitness to practice, not just into whether the alleged misconduct occurred, and therefore matters relevant to aggravation or mitigation of the sanction to be imposed are relevant. LSBA v. Brumfield, 449 So.2d 1017 (La. 1984); LSBA v. Frank, supra.

BACKGROUND OF THE SCHEME
Thomas Barry Wilkinson, the attorney in this proceeding, was a latecomer to the scheme and did not participate in its formulation. The scheme was concocted by three other individuals: William Douglas Wilkinson, Jr. (referred to hereinafter as "Douglas"), the Baton Rouge branch manager of Lomas and Nettleton Company, a multi-state lending institution domiciled in Dallas, Texas (Douglas is a brother-in-law but not a blood relative of Thomas Barry Wilkinson); Matt Eskan, a real estate developer; and Ivy Randolph Creel, an investment adviser. Douglas and Eskan were developers and owners of condominium dwellings in East Baton Rouge Parish. Together with Creel they conceived of a plan to facilitate the sale of the condominiums by inducing Douglas' employer, Lomas and Nettleton, to make loans to buyers for 100% of each purchase price. Because Lomas and Nettleton's policy prohibited it from making loans for more than 80% of the purchase price, the schemers planned to misrepresent and overstate the true sale prices by the use of bogus down payments and sham second-mortgages. According to their scheme, Lomas & Nettleton would be falsely led to believe that it was financing only 80% of each sale when in fact it was lending the buyer 100% of the true sale price. Douglas and Eskan would, of course, provide the condominiums and profit from the sales. Creel would provide, from his investor clientele, buyers wishing to purchase the condominiums as investments. The investment buyers of the condominiums would grant Creel, Douglas and Eskan an 8% retained interest in the net proceeds derived from future resales of the condominiums. Creel would also be paid a 6% management fee for managing the condominiums for the investor-buyers.
In October or November of 1983, Douglas engaged Wilkinson as an attorney to represent Lomas and Nettleton in closing the loans to be made by the lending institution. Wilkinson agreed to provide the legal services and proceeded to close fifty-nine loans amounting to some $2.75 million for Lomas and Nettleton in connection with the sale of condominiums by Douglas and Eskan to Creel's investor clients. Wilkinson also rendered services for Douglas, Eskan and Creel by preparing and supervising the execution of the notes, mortgages and other instruments used to make it appear that the buyers had equity in the properties and that each loan did not exceed 80% of the sale price. Wilkinson did not share with Douglas, Eskan and Creel in the condominium sales profits, retained interests or management fees. He only received a $200 attorney fee for each loan closing from Lomas and Nettleton and a $100 attorney fee for conferring with each buyer-investor from Creel. Wilkinson closed the last loan in connection with this arrangement in September, 1984.

DETERMINATION OF THE SANCTION
A court imposing sanctions for lawyer misconduct should consider (1) the ethical duty or duties the lawyer violated; (2) the lawyer's mental state related to his ethical violation; (3) the extent of the actual or potential injury caused by the lawyer's misconduct; and (4) the aggravating and mitigating circumstances. ABA Standards For Imposing Lawyer Sanctions § 3.0. In the present case, the lawyer's mental state should be considered first because it is the most crucial element and involves a discussion of most of the relevant facts.

A. Factors to be Considered
(1) The Lawyer's Mental State
The most persuasive evidence of Wilkinson's mental state consists of his guilty plea, the admissions by him and his attorney during the guilty plea and sentencing proceedings, the factual basis for the guilty plea presented by the government, *905 and the federal judge's oral reasons for the sentence. The guilty plea, of course, is conclusive proof that Wilkinson committed the essential elements of the offense. Although not conclusive, the other evidence adduced comtemporaneously with his guilty plea and sentencing is presumed to be highly reliable and may not be overcome afterwards except by unequivocal stipulation or clear and convincing proof.
By pleading guilty, Wilkinson conclusively admitted that he committed the essential elements of the offense stated in the bill of information, i.e., that he "did knowingly and willfully aid and abet others ... in a scheme to obtain money from the Lomas and Nettleton Company by means of false pretenses and representations as to the making of down payments and the making of notes payable to the sellers of property purchased by its borrowers...."
At the guilty plea proceeding, Wilkinson, in response to questions by the judge, stated:
Q. Is what the FBI agent said [in testifying to the factual basis for the plea] substantially true?
A. Substantially correct, your Honor.
Q. It's true, then, that you did enter this scheme to, in effect, defraud this Dallas lending institution?
A. Yes, Your Honor. At the time, I did not, at all, view it as a scheme. I later understand [sic] that it was a scheme; yes, sir.
The FBI agent referred to by the Judge had investigated Wilkinson's activities and had testified that sometime between October of 1983 and February of 1984 Wilkinson entered the scheme devised by Douglas, Eskan and Creel, which the agent described as a "phony equity scheme created to show a false loan-to-purchase price ratio to satisfy Lomas and Nettleton's lending requirements"; that the scheme encompassed fifty-nine loans totaling about two million seven hundred and fifty thousand dollars; that, with Wilkinson's knowledge, buyers in the transactions made sham down payments with money supplied by the schemers that was returned to them after the sales; that in some of the transactions Wilkinson knowingly prepared and participated in executing bogus second mortgages which the parties had agreed would be cancelled by him without payment after he sent copies to Lomas and Nettleton; that he knowingly sent copies of the bogus instruments to the lending institution and later cancelled the mortgages in consummation of the misrepresentation; that Wilkinson had admitted that he knowingly approved and acted as notary on the borrowers' false statements and affidavits he supplied to Lomas and Nettleton which asserted that the borrowers had equity in the properties by virtue of the sham down payments or second mortgages; and that Wilkinson had admitted that he and the others involved in the scheme acted willfully, with the knowledge and intent that the officers, underwriters and other employees of Lomas and Nettleton would rely on the false representations to make the loans.
Wilkinson's attorney confirmed Wilkinson's admission to important facts relative to his mental state during his plea for leniency before the federal judge at the sentencing proceeding:
Your Honor, as far as my client, Barry Wilkinson, is concerned, we believe that the overriding issue the court should consider in the exercise of the sentencing options as to Barry Wilkinson was Barry's state of mind during the time of this criminal activity, as well as his state of mind today..... Barry understood, Your Honor, that these investors would not be making any downpayments. In consideration for this, the other three participants were to retain an eight percent interest in the net proceeds derived from the subsequent sale of any of these units. One of the participants was to manage all of the units for these investors and was to receive an eight percent or a six percent management fee. Barry initially viewed this arrangement between the participants and the investors as a legitimate business undertaking. Barry was advised that all of these loans were going to be in-house loans, meaning that they would not be sold to `Fannie Mae' or to any other federal agency, and *906 that there would be independent appraisals, with no loan exceeding eighty percent of the appraised value. But Barry knew that the investors were not going to make any downpayments. Barry reviewed 18 U.S.C. § 1014 and the Louisiana dual contract statute and satisfied himself that those statutes had no applicability to these loan closings. And Barry proceeded to close these loans. But he had a lingering idea, Your Honor, that there might be something wrong with all of this..... It is crucial, Judge, for a full understanding of the limited extent of Barry's participation as an aider and abettor, to state what Barry did not do. Barry did not participate in the formulation of this scheme. Barry did not have any ownership of any of the fifty-nine units. Barry had no knowledge that twenty to thirty thousand dollars was being deposited into the accounts of the individual investors, which enabled them to qualify for these loans. Barry made no representations to the investors that they would not have to make any payments on their second mortgages. And Barry made no promises to any of the investors to buy their units back..... He asks for mercy; and, if not mercy, understanding of how, being so caught up in the daily affairs of life, he ignored his inner voice which told him to take another look at what he was doing.
The federal judge, in sentencing Wilkinson to one year in prison, found that Wilkinson acted with the intent to mislead the lending institution in all of the fifty-nine transactions. The judge, who had the benefit of presentence investigation reports that were not provided to this court, stated:
.... What we have here is a situation where Mr. Creel, Mr. Doug Wilkinson and Mr. Barry Wilkinson and others deceived the lending institution fifty-nine times. Mr. Barry Wilkinson, you deceived your own client fifty-nine times. You filed false declarations, that you knew to be false, fifty-nine separate transactions....
From Wilkinson's guilty plea, the guilty plea proceeding, and the sentencing proceeding, we conclude that on fifty-nine occasions he acted with the intent to deceive the officers, employees or agents of Lomas and Nettleton and to mislead the lending institution into making loans exceeding 80% of the true purchase price of the condominiums.
The joint stipulation introduced by the parties does not present clear and convincing evidence of any fact inconsistent with the foregoing. The stipulation provides that Wilkinson, if called as a witness, would testify to, inter alia, the following: that Creel asked Wilkinson to prepare a "buyback" agreement form that Creel would have his investor-buyers execute; that the "buyback" agreement provided for a different consideration from that stated in the initial sale; that in about May, 1984, Wilkinson redrafted the "buyback" agreement form omitting references and blank spaces relating to "true consideration" and "actual consideration"; that subsequent to May, 1984, the "buyback" forms were filled in and executed in Wilkinson's office; that sometime prior to February 4, 1984, Wilkinson discovered that Douglas, Eskan and Creel were participating in a division of profits from the sales and that Creel would be putting up the down payment for some investors; that during the time involved, the real estate market in the Baton Rouge area was increasing annually, there was no sign of an impending crash, and there was no indication of a substantial change in tax laws regarding such investments; that Wilkinson believed the down payments by Creel amounted to valid consideration paid for Creel's retained interests; that Wilkinson advised Douglas and Creel that he did not wish to participate in a gratuitous return of funds by the seller to the buyer because it might be improper or illegal; that because of the possible illegality Wilkinson researched the law pertaining to such transactions; that Wilkinson asked Douglas his opinion of whether these transactions would be lawful; that Douglas told him that Lomas and Nettleton was very eager to make these loans since they involved "negative amortization notes", a financial arrangement highly lucrative to the lender; that Douglas told him that from *907 Lomas and Nettleton's standpoint as long as the loans were 80% of the appraised value it would not be improper for there to be a return of funds to the investor; that the appraisals were never questioned by anyone including Lomas and Nettleton and the government; that it was Wilkinson's understanding that the Dallas office of Lomas and Nettleton approved the appraisals and that the amounts loaned did not exceed 80% of the appraised value; that Wilkinson understood from Douglas that the source of the funds loaned were "in-house" and that the loans did not involve any federal government institution, agency or any government related or regulated organization; that Wilkinson became apprehensive that the transactions could probably be construed to violate 18 U.S.C. § 1014 (statute prohibiting false statement or over-valuation of land to influence the action of a federally organized, regulated or insured agency); that Douglas informed him he had an opinion from an attorney that 18 U.S.C. § 1014 did not apply to "in-house" loans; that Wilkinson read 18 U.S.C. § 1014 and concluded that it presented no impediment to the loans because they were "in-house" and did not involve any institution listed in 18 U.S.C. § 1014; that Wilkinson also thought that even if the transactions were construed to involve a return of funds to the investors they were nevertheless supported by valuable consideration because of the retained interests of Douglas, Eskan and Creel and Creel's right to management fees; that Douglas told him that there were no violations of other laws of which Douglas was aware; that Wilkinson was of the opinion that the transactions complied with La.R.S. 9:2989 (prohibiting use of dual or dummy sale contract to induce loan unless based on independent appraisal) because Lomas and Nettleton relied on independent appraisals in granting the loans; that Wilkinson believed that after he closed the last loan for Lomas and Nettleton in September, 1984, Douglas, Creel and Eskan developed differences between them; that Creel told him that future closings might involve savings and loans institutions, but that Wilkinson objected and refused if the loans were to be structured like the Lomas and Nettleton loans; that his reason for objecting was that 18 U.S.C. § 1014 specifically covered savings and loan institutions; that, after his discussion with Creel, Wilkinson conferred with his law partners and they concluded that there had been nothing illegal about the Lomas and Nettleton transactions because all parties had received and given valuable consideration; that in the approximate two year period of closing loans for Creel and his corporation, LAREEL, Wilkinson's law firm grossed approximately $140,000 in closing fees from which the firm netted approximately $50,000 that was distributed to the partners; that Wilkinson does not by these statements intend to deny his guilt; that Wilkinson admits to participating in the activities alleged by the government.
From the record presented as the basis for our decision, including the stipulated testimony, we conclude that the Committee has proved conclusively that Wilkinson intentionally made misrepresentations to his client, Lomas and Nettleton, and thereby misled the client into making fifty-nine loans exceeding 80% of the sale price contrary to its lending policy; that the Committee failed to prove with clear and convincing evidence that Wilkinson was aware that his actions were unlawful; that Wilkinson did not believe that his actions would prove to be harmful to his client because a reversal of the upward trend in real estate values was not generally foreseen; but that Wilkinson was aware that there was a potential for great harm to his client in the event of an unexpected downturn in the real estate market.
(2) Ethical Duties Violated
Wilkinson, by participating in the phony equity scheme, violated duties owed to both his client and to the public. On fifty-nine occasions he aided and abetted others in inducing his client to make loans by false representations and pretenses. By these acts he knew or should have known that he was dealing improperly with his client's property and causing potential injury to the client. Standards, supra § 4.1. *908 By the same token, Wilkinson's misconduct was also a violation of his duty to avoid conflicts of interest because he engaged in representing Lomas and Nettleton, with the intent to benefit himself and others, knowing that his interests were adverse and potentially seriously injurious to those of his client. Standards, supra § 4.3. See Rules of Professional Conduct, Rule 1.7. Further, his ethical violations betrayed his duty of candor and honesty to his client because they involved deception of the client with the intent to benefit himself and others while exposing the client to serious potential injury. Standards, supra § 4.6. See Rules of Professional Conduct, Rule 1.7. Moreover, Wilkinson's misconduct amounted to violations of his duty to the public to maintain personal integrity because he engaged in serious criminal conduct, a necessary element of which included false swearing and misrepresentations. Standard, supra § 5.1. See Rules of Professional Conduct, Rule 8.4.
(3) The Extent of Injury Caused by the Lawyer
The federal sentencing judge decided not to order any of the participants in the scheme to make restitution because it was not possible at the time of sentencing to determine the amount of the actual loss sustained by the lending institution. Likewise, the record presented to us does not contain any information by which we may calculate or estimate the actual loss. On the other hand, it is clear that a real potential for injury to the lending institution was created by the scheme in which Wilkinson participated. We note that Lomas and Nettleton's civil claims against Wilkinson have been settled to their satisfaction by his malpractice insurer.
(4) Aggravating and Mitigating Circumstances
We find several aggravating factors present in this case: Wilkinson acted at least partially out of a dishonest or selfish motive; he also engaged in a pattern of misconduct, and committed multiple offenses, despite his substantial experience in the practice of law. Standards § 9.22. All of these factors except for the first one are self explanatory.
We believe that Wilkinson was at least partly selfishly motivated because he collected fees for his work, although the amounts he earned from the phony equity scheme were relatively small. His stipulated testimony also reveals that his legal firm collected substantial additional fees from Creel for loan closings not related to the scheme during the existence of the phony equity scheme.
We also find a number of mitigating factors: the absence of a prior disciplinary record, full and free disclosure to the disciplinary board and a cooperative attitude toward proceedings, an outstanding character or reputation (except for the offense involved here), interim rehabilitation, imposition of other penalties or sanctions, and remorse. We need not comment further on his prior good record and cooperative attitude. His exemplary character (except for his involvement in the phony equity scheme) has been attested to in letters filed in the record by consent from numerous fellow attorneys, judges, law school classmates, former law partners, former clients and public officials. Virtually all praise his honesty and high moral character and express surprise at his criminal conviction. A large percentage of these character witnesses who have had social or professional relations with Wilkinson following his conviction attest that he is deeply remorseful. Many are certain that he has been irrevocably chastened by having served six months in prison and an additional three months in a half-way house; that his suffering has been compounded by the emotional and economic harm that his crime has caused his wife and four young children; and that because he is a devoted father and husband, and is basically a person of good moral character, these events have brought about his complete rehabilitation.
Our impression, in summary, is that while it cannot be said that Wilkinson acted altruistically, it appears from the record before us that he did not assist or participate in the phony equity scheme rapaciously *909 or for great personal profit. His greatest sin was his disloyalty to and deception of his client, Lomas and Nettleton. His misconduct arose out of his blindness to the potential damage he assisted in causing Lomas and Nettleton and his uncritical compliance with the wishes and objectives of Douglas, Eskan, and Creel, whom he apparently considered to be his more important clients.

B. Application of Factors
In applying the factors to determine the sanction, it is helpful to do so in two steps: first, the court should decide upon the starting point or base-line level of sanction warranted by focusing on the nature of the duty violated, the lawyer's mental state, and the actual or potential injury resulting from his misconduct. See Standards, II Theoretical Framework, p. 6, § 9.1; second, using that level of sanction as a starting point, the court should apply the aggravating and mitigating factors to the base-line sanction in order to "fine tune" or shape the sanction to fit the unique facts and circumstances of the particular case. Id.; LSBA v. Amberg, 553 So.2d 448 (La.1989).
Wilkinson's misconduct involved violations of several duties, the majority of which call for a base-line sanction of disbarment. Suspension is appropriate when a lawyer knows or should know that he is dealing improperly with his client's property and causes actual or potential injury to the client. Standards § 4.12. On the other hand, disbarment is called for in a case involving a conflict of interest, when a lawyer, without the informed consent of the client, engages in representation of the client, knowing that the lawyer's interests are adverse to the client's, with the intent to benefit the client or another, and causes potentially serious injury to the client. Standards § 4.3. Furthermore, disbarment is appropriate when a lawyer knowingly deceives a client with the intent to benefit himself or another, and causes actual or potentially serious injury to the client. Standards § 4.61. Finally, disbarment is suitable when a lawyer violates his duty to the public by serious criminal conduct involving false swearing, misrepresentation or fraud; or when a lawyer's intentional conduct involves dishonesty, fraud, deceit or misrepresentation that seriously reflects on his fitness to practice. Standards § 5.11.
Applying the aggravating and mitigating factors to the base-line sanction, however, we conclude that a major suspension instead of disbarment should be imposed because the substantial mitigating factors greatly outweigh the aggravating circumstances.
Prior to his involvement in the phony equity scheme, Wilkinson not only had a clean record and a good reputation, he was admired as a young lawyer with outstanding qualitiescomplete honesty and integrity; familial devotion; public and civic mindedness; commitment to the ideal of justice and fair dealing as an assistant prosecutor. He has been thoroughly punished for his crimehe was sentenced to one year in prison, of which he actually served six months in prison and three months in a halfway house. Superimposed on this penalty, of course, he has suffered the social, economic and emotional stigmata of being incarcerated, suspended from his profession, and disgraced before his community, his family and his four young children. He is, we believe, genuinely remorseful, contrite and rehabilitated. Although we normally view unsworn character attestations with a certain amount of skepticism, the array that has been filed in Wilkinson's behalf with the joint stipulation and approval of the Committee is unusually impressive in volume, variety, quality and ardor. The Committee was unable to produce any evidence that Wilkinson's misconduct actually harmed anyone. His breaches, of course, caused potential harm, but we are unable to tell from the record whether the potential is great or small. The record does not reflect how many, if any, of the loans are currently regarded as "bad", or how "bad" they might be.
The aggravating factors are not nearly so weighty in comparison. Wilkinson's motive in aiding and assisting in deceiving his client was not honest or unselfish, but, on *910 the other hand, he did not intend to reap any great financial gain or to cause his client any actual harm. If Wilkinson's misconduct had not involved disloyalty to his client and had not involved a repetitive pattern of such violations involving substantial sums, his misconduct may have warranted only a short suspension or a reprimand.
Considering all of the foregoing factors, as well as a number of somewhat similar cases, see LSBA v. Rosenthal, 515 So.2d 797 (La.1987); LSBA v. Meyer, 478 So.2d 1211 (La.1985); LSBA v. Kramer, 420 So.2d 1110 (La.1982), we conclude that a suspension from the practice of law for thirty months, commencing on, May 10, 1989, the date of Wilkinson's actual removal from the practice of law by incarceration, and running concurrently with the interim suspension previously ordered, is the appropriate sanction.
For the reasons assigned, the respondent attorney, Thomas Barry Wilkinson is suspended from the practice of law for thirty months, commencing on May 10, 1989, at respondent's cost.
ATTORNEY SUSPENDED FOR THIRTY MONTHS.
SHORTESS, J. Pro. Tem., dissents as I feel the mitigating circumstances justify a twenty month suspension.
NOTES
[*] Judge Melvin A. Shortess of the First Circuit Court of Appeal participated in this decision as Associate Justice Pro Tempore.