339 So.2d 934 (1976)
E. J. DUGAS
v.
William A. SUMMERS, III and Caliste Beard, Jr.
No. 7663.
Court of Appeal of Louisiana, Fourth Circuit.
November 16, 1976.
Writ Refused February 14, 1977.
Thomas K. Regan, Crowley, for plaintiff-appellant.
Greenberg & Dallam, Nathan Greenberg, Gretna, for defendant-appellee.
*935 Before LEMMON, MORIAL and BEER, JJ.
BEER, Judge.
Plaintiff-appellant, Elton J. Dugas, a private investigator, brought this action (initially in proper person) against defendant-appellee, William Summers, III, an attorney, for the recovery of funds allegedly due. Thereafter, Dugas retained counsel who supplemented the original petition by joining defendant-appellee, Caliste Beard, Jr., also an attorney, and alleging an oral partnership agreement between Dugas and both attorneys. That supplemental petition also increased the amount prayed for. A second supplemental petition was filed to add another demand to those listed in the first supplemental petition, and further increased the amount of the claim. A third supplemental petition merely noted a computational error in the second supplemental petition and, accordingly, revised the amount of the prayer downward. Several exceptions were filed, adjudicated and dismissed. The case was heard on the merits on various dates, and judgment was rendered in favor of defendants Summers and Beard, and against petitioner Dugas, who, thereafter, perfected this devolutive appeal.
Dugas claims that he made an agreement with Summers and Beard whereby he (Dugas) was to receive one-third of the attorneys' fees in all cases referred to them by him. Beard and Summers deny that there was such an agreement and contend that Dugas performed "investigative services" for which he was fully paid.
Accordingly, the principal issues for our consideration are:
1. Does the record contain sufficient proof that such an agreement existed between the parties?
2. If so, is the agreement enforceable?
Dugas' basic contention is this: A meeting took place in Lafayette, Louisiana, between the litigants, during which they then and there confected a fee-splitting referral agreement which resulted in various cases being referred by Dugas to Summers and Beard. These cases produced attorneys' fees for Summers and Beard, who were to pay Dugas his agreed upon share of same. Their failure so to do resulted in this litigation.
The trial, lengthy and burdened with much repetitious testimony, commenced on January 28, 1974, and then adjourned to be reopened on February 7, 1974, May 19, 1975 and June 30, 1975.
Dugas testified that although he is a licensed private investigator, the arrangement he confected with Summers and Beard was based upon an understanding that he would receive one-third of the attorneys' fees on all the cases he referred to them. Dugas claims that the fee-splitting arrangement was consummated at a restaurant at Lafayette with Patrick Jones, William Summers, Caliste Beard, Roy Benoit and himself present at the meeting. A written contract was not confected because "they (Beard and Summers) never wanted to give me a contract to the agreement. They said it was illegal for them to give me a contract." Dugas contends that he did very littleif anyinvestigation in connection with any of the referred cases and confirms that he entered into similar fee-splitting arrangements with other attorneys in which he performed no investigative services but referred the cases to the attorneys in return for one-third of the attorneys' fee.
In describing the circumstances surrounding the taping of various telephone conversations between the litigants, Dugas testified that the taping commenced when he informed Beard that Summers was withholding certain monies acquired in settlements involving all three men and that, as a result, Beard went to Dugas' house and called Summers on the phone, knowing that Dugas' phone was rigged for recording. Dugas testified that he relied on the tapes because ". . . any time you are dealing with some crooks, you have to find something to combat the situation."
In response to cross examination, Dugas acknowledged that he had been previously arrested at various times and charged with *936 aggravated rape, defamation, simple rape, criminal conspiracy to commit burglary and impersonation of a police officer.
The testimony of Mrs. Carolyn Hebert, Mr. Essie Joseph Guidry, Mrs. Virgie Gaspard, Mr. Joseph A. Bonicard and Mrs. Maurice Savoie indicated little more than that Dugas was instrumental in referring them to Beard and/or Summers for the prosecution of various tort or compensation claims.
Scattered, but relatively unconfirmed references to threats against Dugas appeared in some of the testimony. For example, Linus J. Mier, a former employee of Dugas, testified that in January, 1974, he and Dugas had planned to go to Jacob's Restaurant in Lafayette for the purpose of attempting to record a conversation which was going to evidence a threat on Dugas' life. Lanier Cherry corroborated the Mier testimony to the extent that he (Cherry) informed Dugas that Beard had expressed a desire to "waste" Dugas. Cherry seemingly qualified this startling testimony by stating "we were all joking and acting crazy, having a few drinks" when Beard allegedly made such a statement at the Purple Peacock Lounge. Although Dugas testified that such threats were made, he admits that he, in turn, threatened Beard because he (Beard) and Summers were "manipulating" not to pay him on one or more of the "referred" cases. Beard's former partner, James Mouton, corroborates Beard's testimony that threats were made by Dugas against Beard.
Roy Benoit partially corroborated Dugas' allegation that some fee-splitting arrangement was discussed at the meeting in a restaurant in Lafayette although Mr. Benoit remembered very little else about the discussion and was unsure if Dugas, Summers and Beard were "serious" about the agreement.
Summers and Beard deny the existence of any fee-splitting agreement with Dugas and contend that Dugas was employedon occasionsas an investigator. Summers testified that the investigative fee agreements with Dugas varied with the cases.
Even though Dugas brought some cases directly to him, Summers earnestly contends that there was no agreement other than that he (Dugas) was to be paid if he rendered investigatory services.
The testimony elicited at the trial indicated that Summers and Beard had various disagreements as to their own fee-splitting arrangement and, as a result, Beard eventually filed suit against Summers.
Much repetitious and generally indecisive testimony deals with the various cases which formed the common nucleus of the alleged Beard-Summers-Dugas relationship. The record indicates many instances of quarrelling between the examiner and the witness but little evidence of serious probative value.
Regarding the Lafayette meeting, Patrick Jones, an attorney who is a pilot, acknowledged that he flew Summers to Lafayette on April 30, 1969, for a meeting with Dugas and Beard and that some other person (presumably Roy Benoit) who had come to the restaurant with Dugas "went off and talked to someone else" during lunch. Jones denies that Roy Benoit was at the luncheon table, thus contradicting the testimony of Benoit as well as Dugas on this point. Jones further testified that he was at the luncheon table during the entire course of the meal and heard no fee-splitting agreement consummated between Dugas on the one hand and Beard and Summers on the other. In fact, Jones contends that the discussions were relative to certain fee arrangements between Beard, Summers and himself.
Finally, James Mouton, attorney and former partner of Beard, testified that Dugas had approached him regarding a fee-splitting arrangement but that he rejected the proposal.
Certain cancelled checks were introduced into evidence allegedly supportive of the fee-splitting arrangement. In each instance, there was contravening testimony to explain the basis upon which the checks had been issued. For example, Summers testified that his check no. 296 payable to Dugas *937 for $1,275 was not a split of a fee from a particular case but for "accumulative bills for investigative services that Mr. Dugas had performed prior to that time."
The trial judge, after reviewing all of the evidence and hearing the testimony of all of the witnesses, concluded that Dugas was, in the vernacular, a professional "runner." We believe that the record supports this finding by the able trial judge. But, further, our appraisal of the entire record of these unsavory proceedings leaves us with the belief that Summers and Beard knew that they were dealing with a "runner" and that such arrangements as were made with Dugas was not for investigative services to be performed on a case by case basis but did contemplate some method of compensation to Dugas in return for his referral of possible clients whose claims, when reduced to settlements or judgments, would produce fees to be distributed between the parties regardless of whether or not any investigation had been performed.
Notwithstanding these views, we believe that this matter is ultimately governed by LSA-R.S. 37:213, which provides, in part, that:
"No person, partnership or corporation shall solicit employment for a legal practitioner."
Dugas' First Supplemental and Amended Petition avers:
"That your petitioner is a duly licensed and authorized investigator in the State of Louisiana, and for approximately the past two years was employed by defendants herein, at different times for the purpose of investigating certain civil cases; and in addition that a partnership was formed between plaintiff and defendant for the purpose of sharing fees on all cases referred to defendant by plaintiff herein on the basis of one-third (1/3) to each of them, which one-third (1/3) share of plaintiff herein would include his investigation charges in their entirety."
Even more compelling is the record itself which we believe supports a finding that Dugas' principal activity was the referral of cases to (among others) Summers and Beardnot the performance of investigatory services. Dugas did only minimal investigatory work in but two cases out of nine cases which form the nucleus of his claim and his own testimony confirms fee-splitting arrangements with other attorneys not for investigative services, but for referring cases.
Besides constituting possible grounds for disbarment of the involved attorney and violating R.S. 37:212, et seq., a fee-splitting arrangement for "referrals" between attorney and layman is clearly against public policy.
Though Van Horn v. Vining, 133 So.2d 901 (La.App.2nd Cir., 1961), deals with a claim for nursing services rendered by one knowingly not licensed to practice nursing in Louisiana as required by LSA-R.S. 37:961, the court's conclusion is here appropriate:
"A fundamental principle of our law is that individuals cannot, by their agreements, derogate from the force of laws enacted for the preservation of the public order and good morals (LSA-C.C. Art. 11), and that whatever is done in contravention of a prohibitory law is null (LSA-C.C. Art. 12). Thus, as a general rule, all contracts or agreements which directly or indirectly involve, or have for their object, a violation of the law are illegal, and, generally, it is immaterial whether the thing forbidden is malum in se or merely malum prohibitum. Such contracts or agreements are void in the sense of being enforceable. LSA-C.C. Arts. 1891, 1892, and 1895; 17 C.J.S. verbo `Contracts' IX. Illegality, Sees. 189-191, pp. 544-545."
Jary v. Emmett, 234 So.2d 530 (La.App. 1970), writs ref. 256 La. 374, 236 So.2d 502 (1970), followed Van Horn and extended the above noted holding to an action premised on quantum meruit. The court found "no theoretical distinction" and concluded that: "Since the basis of quantum meruit is an implied contract to pay for services rendered, no recovery can be had where the contract implied is illegal."
*938 In Andrus v. Guillot, 160 So.2d 804 (La. App.3rd Cir., 1964), a collection agency contracted with a plumber to collect an overdue account. Thereafter, as a result of the actions of his own attorney, the plumber collected the account and the collection agency sued for its "commission." The trial court rendered judgment in favor of plaintiff, and defendant appealed. The appellate court reversed, finding the contract illegal and unenforceable. It held:
"In view of the decision in the Meunier case, supra,* and LSA-R.S. 37:212 et seq., we are of the opinion that the contractual rights which plaintiff seeks to enforce in the instant case are illegal and against public policy because the consideration therefor calls for plaintiff to engage in the practice of law, which he is not qualified to do under the laws of this State." (*Meunier v. Bernich, La.App., 170 So. 567.)
Dugas' acknowledged referral practices violated LSA-R.S. 37:212 et seq., and the record clearly supports the trial court's factual finding that he was a "runner." Although we believe that a fee-splitting referral arrangement did exist between Dugas, Summers and Beard, we, nevertheless, conclude that to the extent it did exist, it was illegal, against public policy andthus unenforceable.
The predecessor to this court, speaking through Judge Janvier, has observed in language clearer than any that we might attempt that:
"No principle of law is better settled than that a party to an illegal contract or an illegal transaction cannot come into a court of law and ask it to carry out the illegal contract or to enforce rights arising out of the illegal transaction." Bergeron v. Mumphrey, 38 So.2d 411 (Ct. of App., Orls., 1949).
Accordingly, the result reached by the trial court is, in all respects, correct and is, therefore, affirmed.[1] Each party to the appeal is to bear his own costs.
AFFIRMED.
LEMMON, J., concurs.
LEMMON, Judge (concurring).
Dugas' petition failed to state a cause of action for which relief can be granted.
R.S. 37:213 provides that "(n)o person. . . shall solicit employment for a legal practitioner". In stating his cause of action, Dugas alleged that he had solicited employment for lawyers in response to an offer for remuneration. Inasmuch as C.C. art. 1892 declares void a contract having an object which is forbidden by law, a contract based on an offer by a legal practitioner to pay remuneration for soliciting employment is void and unenforceable.
It is with some hesitation that I reach this result, which in effect allows a lawyer, who himself violates the law by offering remuneration to a runner, to then urge his own violation as a defense to a suit to collect the remuneration. Nevertheless, the runner himself is unclean in such a situation, particularly if the runner is aware that his solicitation and the lawyer's payment therefor are both prohibited by law.
We cannot allow the use of the courts for enforcement of such contracts. When a lawyer offers a runner remuneration for soliciting employment and the runner accepts the offer by producing a client, the runner does so at the risk that he will not be paid for this illegal act and will have no recourse to the courts to enforce the contractual obligations.
NOTES
[1] It is not without grave concern that we affirm. The basis upon which appellees have escaped liabilityon the facts found by us does them no credit.

The conclusion we are here obliged to reach should not be erroneously interpreted as in any way protective of lawyers who make use of runners and, thereafter, seek to avoid payment for that nefarious service. We abhore such practice and encourage the imposition of swift and meaningful sanctions calculated to result in their prompt and final abatement.