DIXON, Justice.
After conducting formal investigatory hearings, the Bar Association, through the Committee on Professional Responsibility, filed two petitions on August 15,1977 seeking disciplinary action against Caliste Beard, Jr. and William A. Summers, III. The cases were consolidated, and, after hearings were held, the Commissioner filed his report in January, 1979.
The petition filed by the Bar Association alleges substantial violations of Disciplinary Rules 1-102 and 2-103 of the Code of Professional Responsibility.[1] According to the petition Beard and Summers, in collaboration with a non-lawyer named Elton J. Du-gas, engaged in a plan which provided for Dugas to seek out individuals who had sustained personal injuries or who had claims for wrongful death and to recommend the professional services of either Beard or Summers to them. The petition alleges that Beard and Summers divided fees on these referred cases, and that Dugas either received or believed himself entitled to receive a portion of the fee.
The petition then specified instances of the alleged violations. Dugas allegedly rec *1180 ommended Summers to Mrs. Vergie Gas-pard to prosecute her claim for her husband’s accidental death and to Mrs. Maurice J. Savoie in connection with her son’s personal injury claim. Dugas also is alleged to have referred Summers to Donald W. Crawford and Allen Pinky Garrett who both had sustained personal injuries. Beard was allegedly introduced to Mrs. Carolyn Hebert to pursue her claim for her husband’s wrongful death and to Edward Babin, Larry Goods and William Breeland to represent them in personal injury suits. Dugas also allegedly recommended both attorneys to Mrs. Wilton J. Bergeron with respect to injuries sustained by her husband.
In his report the Commissioner found that Dugas had received financial remuneration from Beard and Summers as a consequence of his referrals to them, and that Beard and Summers accepted employment from the non-lawyers whom Dugas referred to them. On the other hand, the Commissioner concluded that the Bar Association had failed to prove the existence of a fee splitting arrangement involving Dugas or that Dugas had ever received a share of the attorney fees from any of the cases which he sent to the two attorneys. Although the Commissioner ruled that the evidence was insufficient to establish the allegations that Summers had represented Donald Crawford and Allen Garrett as a result of Dugas’ solicitation, he otherwise found that the Bar Association’s allegations had support in the record. Both the Bar Association and the respondent attorneys seek review of these conclusions.[2]
A review of the instant record is convincing that the Commissioner’s conclusions are justified. Elton Dugas made primary contact with injured parties or their close relatives and usually persuaded them to hire him as an investigator for a fee of $100 a day and expenses. A clause in the contract authorized Dugas to secure legal representation for the prosecution of the asserted claim; Dugas usually told his clients that his fees would be paid by the attorney out of any settlement. Dugas then recommended either Summers or Beard, and either introduced the attorney to the prospective client or arranged a meeting for them. Dugas was not paid a regular fee by either lawyer, but instead was paid at the conclusion of litigation and as a consequence of each referral. It is also clear that both Summers and Beard accepted employment under these terms and conditions.
However, in our view, the Commissioner was correct to conclude that the Bar Association had failed to prove a fee splitting plan involving Dugas. Only Dugas himself testified on this point, and he was unable to support his testimony with any documentary evidence. For example, from 1972 to 1975 Dugas failed to report his income to the Internal Revenue Service; he said he filed “some” tax returns for the years 1968-1971, but did not produce copies of them, as ordered. He produced no other record to support his claim that he had received large sums of money from Summers and Beard. Moreover, Dugas’ testimony on this point was rebutted by James A. Mouton, Caliste Beard’s partner during this period, who handled the firm’s financial dealings. Mouton stated that Dugas was paid according to itemized statements for services and was never paid in cash. He also stated that Dugas had once proposed a fee splitting plan to Beard and him and that both had rejected it out of hand.
In short, the Commissioner apparently chose to disregard much of Dugas’ unsupported testimony on this point of inquiry, a decision finding ample support in the record. There is every indication that Dugas carries a grudge against Summers and, especially, Beard, who is a distant relative, and that he will go to great lengths to see either man ruined professionally. Beard *1181 testified that Dugas had frequently threatened his person, property and reputation, one time going so far as to invade his hotel room in New Orleans while armed with a revolver. Two attorneys hired by Dugas to sue Beard concerning overdue “investigative fees” testified that he became irate when they sought to withdraw from his case and that he threatened them with disciplinary action. The Commissioner no doubt noted also that Dugas’ testimony on October 15, 1976 that he did not have a similar arrangement with another well known attorney was contrary to his testimony in a civil action made part of the record in the instant proceedings. Moreover, Dugas’ testimony was also called into question by Mrs. Maurice Savoie, a nurse at Lady of the Sea Hospital in Galliano, who denied that she had agreed to refer personal injury cases to Dugas for a percentage of any recovery. For these reasons, the Commissioner’s apparent decision to reject much of Dugas’ testimony was not without reason.
This same hesitancy to credit much of Dugas’ testimony lies behind the Commissioner’s finding that Summers had not been improperly retained in the Crawford and Garrett cases. The only testimony concerning these cases came from Dugas and consisted of short references, in contrast to the more detailed evidence introduced concerning the other specific allegations of solicitation. Dugas also stated that Mrs. Savoie referred Crawford to him as part of their financial arrangement, but she disputed this at the hearing. Once the Commissioner discounted Dugas’ testimony, there was no evidence that Summers’ representation of either client was begun improperly.
On the other hand, there was ample evidence besides Dugas’ testimony concerning the other charges. Mrs. Gaspard, Mrs. Ber-geron, Mrs. Savoie and Mrs. Hebert all testified, corroborating the testimony of Du-gas. Respondents do not deny that Dugas referred cases to them. Beard corroborated Dugas’ testimony that he removed Summers from the Bergeron case and replaced him with Beard, who settled the case. Beard admitted paying Dugas for “investigation” on three cases — $1000, $800, and a forgotten amount. There was “clear and convincing evidence” (Louisiana State Bar Association v. Edwins, 329 So.2d 437 (La.1976)) supporting the Commissioner’s findings concerning these charges. We therefore conclude that the report filed by the Commissioner is correct.
The Committee on Professional Responsibility has recommended severe disciplinary action up to and including the disbarment of Caliste Beard, Jr. and William A. Summers, III.
These solicitations occurred in 1969 and 1970. Ever since the settlement of the Ber-geron case these lawyers have suffered from their association with Dugas, who has proved himself to be, at best, an amoral parasite. Beard and Summers have been through litigation with Dugas (Dugas v. Summers and Beard, 339 So.2d 934 (La.App. 1976), writ denied, 341 So.2d 1132 (La.1977)), investigation, lengthy disbarment proceedings, and the shame of publicity for using a professional runner.
The penalty which we impose in these cases must not be considered our measure of the serious nature of the offenses here involved. Accepting cases from non-lawyers, referred by a solicitor who expects to be and is rewarded, cannot be condoned; the professional character of the practice of law could not survive the hunting down and marketing of personal injury claims. Nevertheless, the penalty in disciplinary proceedings is not so much to punish the lawyer as to protect the public.
If all of Dugas’ testimony could be believed, respondents should be disbarred. It is not all believable; Dugas’ testimony culminates years of threats to destroy two lawyers who would not be blackmailed into sharing a large fee with him. The interests of the public will be protected by a sentence less than disbarment.
For these reasons, respondents Caliste Beard, Jr. and William A. Summers, III are suspended from the practice of law for one year from the finality of these proceedings, and are cast for all costs.
*1182 BLANCHE, J., dissents, being of the opinion that respondents should be suspended for a period of three (3) years.

. DR 1-102 provides:
“(A) A lawyer shall not:
(1) Violate a Disciplinary Rule.
(2) Circumvent a Disciplinary Rule through actions of another.
(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.”
Until amended September 10, 1975, DR 2-103 provided in pertinent part:
“(A) A lawyer shall not recommend employment, as a private practitioner, of himself, his partner, or associate to a nonlawyer who has not sought his advice regarding employment of a lawyer.
(B) Except as permitted under DR 2-103(C), a lawyer shall not compensate or give anything of value to a person or organization to recommend or secure his employment by a client, or as a reward for having made a recommendation resulting in his employment by a client.”

. The Commissioner properly overruled pleas of prescription and estoppel. Louisiana State Bar Association v. Loridans, 338 So.2d 1338 (La. 1976); In re Kenner, 178 La. 774, 152 So. 520 (1931). It is also clear that there is no question of an ex post facto application of DR 1-102 and 2-103. As the Commissioner noted, the actions committed before July 1, 1970, the effective date of the Code of Professional Responsibility, constituted a breach of Canon 27 of the Canons of Ethics.