LABORDE, Judge.
Plaintiffs, Andrew Vidrine and J. Lee Wimberley, Jr., instituted a petition for ex-ecutory process seeking to enforce a promissory note dated November 19, 1986, executed by the defendants, Joseph Abshire and Virginia Marie Thomas Abshire, in the amount of $31,660.00. The promissory note was secured by a collateral promissory note, executed by the defendants, in the amount of $131,660.00 and by a collateral mortgage, in the same amount, bearing on the defendants’ interest in properties located in Iberia Parish. Subsequently, defendants filed a petition to enjoin the exec-utory proceedings. The trial judge issued a temporary restraining order on May 27, 1988. On June 21, 1988, a hearing was held on defendants’ motion for preliminary injunction. After the hearing was concluded, the trial judge took the matter under advisement. In his judgment signed on July 6, 1988, the trial judge granted the preliminary injunction, thereby prohibiting the Sheriff of Iberia Parish from executing the writ of seizure and sale. The plaintiffs appealed devolutively to this court from the judgment granting the preliminary injunction. We affirm.
FACTS
This case presents a factual morass. We find that the trial judge did an admirable *290 job in sorting through and delineating the crucial events leading up to this lawsuit, and we adopt as our own the rendition of the facts laid out in his Reasons For Judgment:
“It is the contention of the plaintiffs that this is a simple executory proceeding, that the defendants owed them money, and to secure the payment of these sums the defendants executed a conventional mortgage on some property that they had purchased in Iberia Parish. The plaintiffs also claim that the defendants owe them large sums in addition to the amount sued on, but that is not being claimed in this lawsuit.
It is the contention of Mr. Abshire that he and his wife did execute the mortgage, however, they had a private agreement with the plaintiffs concerning the payment of the mortgage, and further, that the plaintiffs are holding sums in excess of $100,000 for the Abshires and that the amount of the mortgage should be set-off against the plaintiffs’ claim.
The plaintiffs, Andrew Vidrine and J. Lee Wimberley, Jr., are attorneys at law, practicing law in a partnership in the town of Church Point, Louisiana.
Mr. Abshire has proven that he was employed by Mr. Vidrine to “run” cases for the law firm, and that whenever he brought a lawsuit into the firm then Mr. Abshire would get 10 percent of the fees received by the plaintiffs. He has proven this by clear and convincing evidence. The questions remains whether the plaintiff law firm is holding money in a trust account for Mr. Abshire and they argue that even if this is so that Mr. Abshire cannot get a set-off because it is an illegal contract and Mr. Abshire cannot enforce a contract for services as a runner for their law firm.
Mr. Abshire’s involvement with the plaintiff attorneys came about as a result of an accident Mr. Abshire had in August 1981. He was injured when he fell through a step on a house he was renting, and he employed the plaintiffs to sue the lessor of the home he was living in.
Mr. Abshire testified that the plaintiff attorneys advanced him a few dollars until late 1982. His case lasted until September 1985, when a jury awarded Mr. Abshire $9,000; the case was appealed apparently until around September 1987, but the money was not distributed and apparently either by action of the appellate court or a settlement the award was around $50,000.
Mr. Abshire is 58 years of age, he has a second grade education, he is illiterate, but he can calculate sums. He has worked as a self-employed carpenter and more recently as a runner soliciting business for the plaintiff law firm.
It is somewhat difficult to weed out the sequence of events, especially since the version of the plaintiffs differs from the defendants, and in a large respect there is some fabrication of testimony.
Nevertheless, Mr. Abshire admits that in November of 1986 he signed a note for the plaintiffs who were still his lawyers at that time. $11,500 was borrowed in July of 1986, as part of a loan to buy some property, and the balance was money that was borrowed to purchase some land from Allen Romero, which is the subject of the mortgage. Mr. Abshire testified that the plaintiffs advised him that the $11,500 was to be paid from the money he was entitled to for bringing in cases. The plaintiffs had gone to a bank in Church Point, borrowed the money, and gave the money to him. The additional amounts above the $11,500 were also to be paid from money the plaintiffs were holding for Mr. Abshire when the cases he brought in would be completed.
Dan Rivette, an attorney who had a casual arrangement with the plaintiff attorneys brought the papers over from Church Point to Iberia Parish where they were executed and duly recorded.
In addition to soliciting cases for the plaintiff attorneys, Mr. Abshire also apparently did some chauffeur work. He would pick up clients, bring them to doctors, make trips to Houston or deliver subpoenaes and other kind of work.
Mr. Abshire said that in May of 1983 he brought in his nephew, James Ham-mon, on a ease, and at that time Mr. *291 Vidrine told him that he would give him 10 percent of the attorney’s fees when the case was ended. Some of the money he received from the plaintiffs were for bringing in cases but he also received some money for various and sundry duties for the plaintiffs.
In 1983-1984, Mr. Abshire had two surgeries and the plaintiffs advanced some money for this. Borrowed sums were to be repaid from Mr. Abshire’s own case or a case that the plaintiffs were handling for his son. The payments would come out of the 10 percent finder’s fee, and not because of the additional work that he did for the plaintiffs. He called this type work “ticket” work.
He notes that on the Hammon case he received a credit of $7,000 on a $70,000 fee that the plaintiffs received. On a case involving Roger Toups, he received $5,000 in 1985, and in a case involving Terry and Robin Romero he received $5,000 in 1986, but it was supposed to be more.
In 1986 Mr. Abshire received from the plaintiff attorneys over $65,000 in compensation representing the 10 percent fee, and the ticket compensation.
Mr. Abshire believes that the plaintiff attorneys owe him $219,000, subject to a $17,000 credit. On Exhibit 4 he has listed the names of the cases that he has brought into the plaintiffs’ firm, and he has shown the amounts he is to receive from them.
* * * * * *
In 1986 Mr. Vidrine acknowledged that the defendant, Mr. Abshire, earned over $65,000 from the firm. He claimed that Mr. Abshire was paid for investigating cases, transporting clients to and from doctors, and doing various kinds of work on cases as an investigator for the law firm. This comes to some $5,460 a month, and the Court specifically does not believe that Mr. Abshire was hired for transportation purposes but was hired to solicit and bring cases into the firm.
Mr. Vidrine says that his office does not owe Mr. Abshire anything. On being questioned whether Mr. Vidrine personally agreed to pay a 10 percent fee for the cases generated, Mr. Vidrine ... declined to answer, invoking the Fifth Amendment. On being interrogated about whether Mr. Vidrine had hired a Mr. Wingate to run cases, he again claimed his privilege under the Fifth Amendment.
* * * * * *
Mr. Lee Wimberley has been an attorney since 1975,- and he testified that he and Mr. Vidrine are partners and that it was Mr. Vidrine who handled Mr. Ab-shire’s case. He said that in 1986 Mr. Vidrine was in the hospital with cancer and somehow Mr. Abshire came to the law office with $40,000 and had Carla [the office manager] write out a check for $51,500 out of the firm account, which meant that $11,500 was the firm’s money. Mr. Wimberley states that neither Mr. Abshire nor Carla had the authority to make this transaction, and he found out about it later, and caused a commotion, and Mr. Abshire has never paid the money back. Later, however, Mr. Abshire wanted to purchase certain land in Iberia Parish and he stated that he thought he could make some money by selling off part of it, and would pay back the $11,500 plus an additional twenty thousand odd dollars that he needed for the purchase price. He said that he would also pay back the sum of $100,000 that he owed Euclide Bourque. Apparently, Mr. Abshire borrowed money from Mr. Bourque and had the endorsement of the plaintiff attorneys on his note. A note mortgage was prepared on Mr. Ab-shire’s house and the 20 acres he wanted to purchase, Dan Rivette took it to Iberia Parish, and Mr. Abshire would not sign as it called for $131,000 payment. Mr. Wimberley then redrew the mortgage the $11,500 and the new $20,000, and Mr. Rivette went to Iberia Parish and had the papers executed. He too states that Mr. Abshire has not paid anything on either of these loans. Mr. Wimberley testified also that he and Mr. Vidrine paid off the Euclide Bourque loan and Mr. Abshire owes them that amount of money too.
*292 In rebuttal, Mr. Vidrine again took the stand and testified concerning the list that Mr. Abshire introduced in evidence concerning cases that were pending and fees that were owed, and in several separate instances he denied that Mr. Abshire had anything to do with those clients going to his firm.
This is a strange case indeed. Here we have an illiterate man who has a case handled by a law firm, and then he receives money in big figures for running cases, and apparently even borrows bigger amounts with the endorsement of the plaintiffs. None of these strange, fishy arrangements have been explained.”
PRELIMINARY INJUNCTION
We agree that there was apparently something rotten in South Louisiana, as the evidence shows that the defendant was in fact employed by Andrew Vidrine to “run” cases for the law firm. The evidence indicates that the defendant received a percentage of the attorney fees for every case he brought into the law firm. Under LSA-R.S. 37:213 and 37:219, this activity is illegal. These articles provide, in pertinent part, that:
37:213.
“No person, partnership or corporation shall solicit employment for a legal practitioner.”
37:219.(A)
“It shall be unlawful for any attorney to pay money or give any other thing of value to any person for the purpose of obtaining representation of any client.”
Although it is apparent that there was a fee-splitting referral arrangement in existence between the defendant and Mr. Vidrine, and that each party is equally culpable for his part in the scheme, we do not agree with the trial court that the defendant should be able to off-set the debt secured by the mortgage with the money allegedly owed him under the fee-splitting referral contract.
This issue was thoroughly analyzed by the Fourth Circuit in Dugas v. Summers, 339 So.2d 934 (La.App. 4th Cir.1976), writ denied, 341 So.2d 1132 (La.1977). In that case, a private investigator brought suit against two attorneys to recover funds due him under a fee-splitting referral arrangement. In holding that the fee-splitting contract was unenforceable, the court, quoting from Van Horn v. Vining, 133 So.2d 901 (La.App. 2d Cir.1961), stated:
“ ‘A fundamental principle of our law is that individuals cannot, by their agreements, derogate from the force of laws enacted for the preservation of the public order and good morals (LSA-C.C. Art. 11), and that whatever is done in contravention of a prohibitory law is null (LSA-C.C. Art. 12). Thus, as a general rule, all contracts or agreements which directly or indirectly involve, or have for their object, a violation of the law are illegal, and, generally, it is immaterial whether the thing forbidden is malum in se or merely malum prohibitum. Such contracts or agreements are void in the sense of being enforceable.’ ” (Citations omitted)
The court went on to hold that:
“Although we believe that a fee-splitting referral arrangement did exist between Dugas, Summers and Beard, we, nevertheless, conclude that to the extent it did exist, it was illegal, against public policy and — thus—unenforceable.
The predecessor to this court, speaking through Judge Janvier, has observed in language clearer than any that we might attempt that:
‘No principle of law is better settled than that a party to an illegal contract or an illegal transaction cannot come into,a court of law and ask it to carry out the illegal contract or to enforce rights arising out of the illegal transaction.’
Bergeron v. Humphrey, 38 So.2d 411 (Ct. of App., Orls., 1949).” (Citations omitted)
Dugas, at 937-938. In a strongly worded concurrence, Judge Lemmon wrote:
“It is with some hesitation that I reach this result, which in effect allows a lawyer, who himself violates the law by offering remuneration to a runner, to then urge his own violation as a defense to a *293 suit to collect the remuneration. Nevertheless, the runner himself is unclean in such a situation, particularly if the runner is aware that his solicitation and the lawyer’s payment therefor are both prohibited by law.
We cannot allow the use of the courts for enforcement of such contracts. When a lawyer offers a runner remuneration for soliciting employment and the runner accepts the offer by producing a client, the runner does so at the risk that he will not be paid for this illegal act and will have no recourse to the courts to enforce the contractual obligations.”
Id. at 938.
We agree with the Fourth Circuit that a “running” contract is unenforceable and we are unable to see how such a contract could be used as a set-off. The trial judge noted that “[i]t is obvious that the runner in this case, Mr. Abshire, could not sue Mr. Vidrine and Mr. Wimberley for the illegal contract and the proceeds from it, however, it would be irony indeed if he would be thus prevented from setting up an off-set against the money that Mr. Vidrine and Mr. Wimberley are suing for.” To allow the defendant to plead in compensation the “running” contract would be to acknowledge that the “running” contract is an enforceable obligation. This, we are not prepared to do.
Even though we disagree with the trial judge regarding the defendant’s use of the “running” contract as a set-off, we find that there are other grounds for the grant of a preliminary injunction and that these grounds were articulated by the trial judge in his Reasons For Judgment. The trial judge found that the plaintiffs seem to have violated Rule 1.8 of the State Bar Association Rules of Professional Conduct. Rule 1.8 did not come into effect until after the note and the mortgage at issue had been signed, but its predecessor rule, DR 6-104, which was in effect at the time the mortgage and note were entered into, is substantially similar. DR 5-104(A) provides:
“A lawyer shall not enter into a business transaction with a client if they have differing interest therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.”
In Matthews v. Spears, 24 So.2d 195, 198 (La.App. 1st Cir.1945), the court stated that business dealings between an attorney and his client, “will be closely scrutinized by the courts, and if it appears that the attorney did not fully inform his client of all phases of the transaction and its full meaning and import, and any disadvantages that might result to the client, the courts will not hesitate to set aside the transaction.” Also relevant in this regard is the Second Circuit’s statement in Searcy v. Novo, 188 So. 490, 499 (La.App. 2d Cir.1939) that:
“Treating of the relation of attorney and client and the transcendent character of the fidelity due by the attorney, and the burden of proof when a transaction between them is attacked, 2 Ruling Case Law, page 966, § 42, admirably lays down the rule as follows:
‘The relation gives to the attorney great influence and control over the actions and interests of his client, and in view of such fact, all dealings between attorneys and clients will be closely scrutinized by the courts, and transactions between them are often declared to be voidable which would be deemed unobjectionable between other persons. The burden is on the attorney to show that the transaction is fair and equitable, and that the client was fully informed of his rights and interests in the subject-matter of the transaction, and of the nature and effect of the transaction itself, and was so placed as to be able to deal with the attorney at arm’s length.’ ”
Thus, if the plaintiff and attorney failed to comply with their duty of full disclosure in this case, the mortgage could be potentially unenforceable. Under LSA-C.C.P. art. 2751, a preliminary injunction may issue to arrest the seizure and sale of property if the debt secured by the mortgage is legally unenforceable.
*294 We also find that the debt secured by the mortgage may be unenforceable because it is inextricably bound to the “running” contract. The defendant testified at trial that the arrangement between him and the plaintiffs was that the money loaned to him would be paid out of the funds he received from “running” cases. This could well explain why the plaintiffs were willing to lend more money to an individual who already owed them a substantial sum. If the agreement between the parties was that the loan would be paid from the defendant’s earnings from running cases, then it would seem that the loan contract was violative of public policy and thus unenforceable. See LSA-C.C. arts. 11, 12[1], 2030.
We decline to determine the merits of whether the underlying debt is enforceable or not, as the grant of a preliminary injunction is only an interlocutory judgment designed to maintain and preserve the existing status pending a trial of the issues on the merits; in order to obtain the issuance of such an injunction, a petitioner need only make out a prima facie case. First National State Bank of New Jersey v. Barker, 234 So.2d 770 (La.App. 1st Cir.1970). We find that the defendant made such a showing and the trial court did not abuse its great discretion in granting the preliminary injunction.
For the foregoing reasons, the decision of the trial court granting a preliminary injunction to the defendant is affirmed. Plaintiffs are cast for all costs.
AFFIRMED.

. By Acts 1987, No. 124, § 1, LSA-C.C. arts. 11 and 12 were repealed, and were replaced, in substance, by LSA-C.C. art. 7.