ATTORNEY DISCIPLINARY PROCEEDINGS
|, PER CURIAM.
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Michael H. O’Keefe, an attorney licensed to practice law in Louisiana but currently on interim suspension.[1]
PRIOR DISCIPLINARY HISTORY
Before we examine the current disciplinary charges, we find it helpful to review respondent’s prior disciplinary history.
Respondent was admitted to the practice of law in Louisiana in 1955. In 1983, respondent was convicted in the United States District Court for the Eastern District of Louisiana of one count of mail fraud and two counts of obstruction of *81 justice arising from the sale of an apartment building. On December 22, 1983, respondent’s conviction was affirmed by the United States Court of Appeals for the Fifth Circuit. United States v. O’Keefe, 722 F.2d 1175 (5th Cir.1983).
Following the finality of his conviction, respondent filed a petition for consent discipline with this court, seeking to be disbarred. On December 7, 1984, in an unpublished order, we accepted respondent’s petition and ordered him disbarred, retroactive to December 22,1983.
j ¡.Thereafter, respondent applied for readmission. On April 7, 1989, we granted respondent’s application for readmission. In re: O’Keefe, 541 So.2d 843 (La.1989).
UNDERLYING FACTS

The Felony Conviction Matter

In early 1991, Physicians National Risk Retention Group (“PNRRG”), a Louisiana medical malpractice insurer, began to experience financial problems that ultimately resulted in its liquidation. Respondent operated the company that was retained to manage PNRRG during this period of time. As part of the liquidation, and under the pretext of arranging for continued malpractice insurance coverage to protect the physicians insured by PNRRG, respondent arranged to have more than $10 million in cash assets of PNRRG transferred to his law firm’s trust account. In fact, however, the insurance coverage was not maintained and claims were not paid for the insured physicians as promised. Instead, respondent and his cohorts diverted in excess of $7.5 million in assets of PNRRG to themselves personally and to companies they controlled.
In 1995, a federal grand jury returned a multi-count indictment charging respondent and others with conspiracy, mail and wire fraud, and money laundering in connection with the fraudulent insurance scheme. United States v. Michael O’Keefe, Sr., et at, No. 95-0106 on the Criminal Docket of the United States District Court for the Eastern District of Louisiana. On March 21, 1996, a jury found respondent guilty of conspiracy to commit mail fraud and wire fraud, a violation of 18 U.S.C. § 371 (as to Count 1); wire fraud, a violation of 18 U.S.C. §§ 1343 and 1341 (as to Counts 2, 4, and 5-8); and money laundering, a violation of 18 U.S.C. § 1956(a)(2)(A) (as to Counts 14-23).
|3On January 12, 1999, respondent was sentenced to serve 235 months in prison and was ordered to pay restitution to PNRRG in the amount of $1,174,849. On August 11, 2000, the United States Court of Appeals for the Fifth Circuit affirmed respondent’s conviction in an unpublished opinion. On June 11, 2001, the United States Supreme Court denied respondent’s petition for writ of certiorari; his conviction became final on August 6, 2001, upon the Supreme Court’s denial of rehearing in the matter.

The Solicitation Matter

The following recitation is based on the factual findings of the hearing committee, as well as the testimony and other evidence in the record.
Following respondent’s 1983 felony conviction and his readmission to the bar in 1989, respondent resumed the practice of law with the New Orleans law firm of O’Keefe, O’Keefe & Bernstein.[2] By all indications, the firm enjoyed a successful practice concentrated primarily in the defense of insurance companies and the *82 Housing Authority of New Orleans. However, by the mid-1990’s, the firm’s traditional practice base began to decline as political regimes in New Orleans changed and several insurance carriers doing business in Louisiana failed or relocated.
Meanwhile, over the years, certain unscrupulous attorneys in the greater New Orleans area had begun using persons known as “runners” to locate potential accident victims.[3] The practice was largely conducted in the open and was carried out with | ¿little fear of consequence or reprisal. The runners, who often earned as much as $600 cash for each person brought to a lawyer’s office, spoke openly and publicly about their business. In time, this information came to be known by Ernest Aiavo-lasiti, who had previously worked as a legal assistant for a personal injury lawyer. Mr. Aiavolasiti realized that with his prior law firm experience, he could enter this business and thereby generate substantial income for himself, the runners, and the attorneys from whose office they operated.
Sometime in 1994, Mr. Aiavolasiti contacted his long-time friend, Michael Palmi-sano, about joining him in the plan. Mr. Aiavolasiti explained to Mr. Palmisano that in order to bring the plan to fruition, they would need to find a cooperating lawyer with start-up funds to pay the .runners as well as the legitimate costs of funding the personal injury cases. Mr. Palmisano agreed to contact respondent, who years earlier had loaned him money for a business venture, to see if he might be interested in participating in the plan.
Respondent agreed to meet with Mr. Aiavolasiti and Mr. Palmisano, and after the operations were explained, he decided to participate. According to testimony in the record, respondent agreed to provide the law office, funding for the payment of runners, and “case development costs,” as well as attorneys to try the cases that could not be settled. In exchange, respondent was to receive (through entities he owned or controlled) the legal fees generated from the settlement of the personal injury cases. Furthermore, loans and advances to clients were to be provided by finance companies owned or controlled by respondent, charging up to 36% interest and providing an additional source of cash flow to respondent. For their part, Mr. Aiavolasiti and Mr. Palmisano would work in the law office as salaried “legal assistants” and were promised a bonus from profits.
. | ^Respondent was apparently concerned about processing these new personal injury cases through O’Keefe, O’Keefe & Bernstein, as that firm was traditionally a defense firm. Accordingly, respondent approached Greer Goff, a young associate of the O’Keefe firm, about creating a separate law firm known as the “Law Offices of Greer Goff.” Respondent explained to Ms. Goff that Mr. Aiavolasiti and Mr. Palmisa-no were paralegals with “their own cases” to bring 'to her firm. Ms. Goffs role would be to try those cases that Mr. Aiavolasiti and Mr. Palmisano could not settle out of court. Ms. Goff did not question this explanation and agreed to do as respondent asked.
Mr. Aiavolasiti and Mr. Palmisano then began spreading the word to local runners that a new personal injury office was open for business. Slowly, but progressively faster,[4] potential clients were brought by *83 the runners to the third floor of the Canal Street building housing the O’Keefe, O’Keefe & Bernstein firm. After paying the runners in cash from funds provided to them by respondent, Mr. Aiavolasiti and Mr. Palmisano screened the cases and retained the clients on behalf of the “Law Offices of Greer Goff.”
Mr. Aiavolasiti and Mr. Palmisano referred the clients for medical treatment, negotiated settlements, and distributed the settlement funds to the clients. In the overwhelming number of cases, the clients never saw or spoke with Ms. Goff or any other lawyer; when questions arose in the course of the operation, Mr. Aiavolasiti and Mr. Palmisano directed them to respondent. The legal fees generated by the personal injury cases were paid to O’Keefe & O’Keefe, A.P.L.C., an entity owned by | (¡respondent, as well as to O’Keefe, O’Keefe & Bernstein, an entity owned almost entirely by O’Keefe & O’Keefe, A.P.L.C.[5]
Subsequently, certain doctors in the New Orleans area began paying kickbacks in the form of “referral fees” to lawyers who agreed to send injured claimants to their offices for medical treatment. Mr. Aiavolasiti and Mr. Palmisano relayed that information to respondent, and pursuant to his instructions, they began referring some of their clients to Dr. Mark Schwaiger, a chiropractor willing to make such payments.[6] Respondent kept two-thirds of the referral fees paid by Dr. Schwaiger for himself, while Mr. Aiavolasiti and Mr. Pal-misano split the remainder.
This arrangement continued for approximately two years. However, at some point, Ms. Goff began to realize that Mr. Aiavolasiti and Mr. Palmisano were not only working on “their own cases,” as originally contemplated, but were also acquiring new personal injury cases and using her name to do so. Ms. Goff confronted respondent, told him that she was no longer comfortable with the arrangement, and threatened to quit the firm. Respondent placated Ms. Goff for a period of time by promising to address her concerns, but the practice nevertheless continued. Eventually, Ms. Goff resigned from the firm. At about the same time, Mr. Aiavolasiti and Mr. Palmisano left respondent’s employ because the bonuses they had been promised had never materialized.
In April 1996, respondent approached his law partner, Stephen Bernstein, with a proposal that Mr. Bernstein create the “Law Offices of Stephen Bernstein” to serve j 7as a vehicle for continuing the lucrative runner-based operation. Mr. Bernstein agreed, and within a relatively short time, the new firm was bringing in between 180 and 220 new personal injury clients per month. While the cash flow generated by the personal injury business provided a source of funds to pay runners and “case development costs,” Mr. Bernstein still turned to respondent from time to time to provide capital for the operation. In turn, the legal fees generated by the *84 personal injury cases were largely distributed to O’Keefe & O’Keefe, A.P.L.C. and O’Keefe, O’Keefe & Bernstein. The finance companies owned or controlled by respondent continued to provide funding for client advances, reaping 36% returns from clients. Finally, respondent maintained his “referral fee” relationship with Dr. Schwaiger, who met personally with respondent to discuss the arrangement and made those payments directly to him.
The scheme finally came to light in mid-1997, when the ODC commenced an in-depth investigation of the runner-based solicitation industry in New Orleans. As a result of this investigation, several disciplinary proceedings (and in some eases federal criminal proceedings) were instituted against the participants.[7]
DISCIPLINARY PROCEEDINGS

Formal Charges

The ODC filed formal charges against respondent arising out of his felony conviction, alleging that his conduct constituted a violation of Rules 8.4(a) (violation of the Rules of Professional Conduct), 8.4(b) (commission of a criminal act reflecting adversely on a lawyer’s honesty, trustworthiness, or fitness as a lawyer), and 8.4(c) |s(engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct.
In the solicitation matter, the ODC alleged that respondent’s conduct violated Rules 5.5(b) (assisting a non-lawyer in the performance of an activity that constitutes the unauthorized practice of law), 7.2(a) (improper solicitation of professional employment by a lawyer or through others acting at his request or on his behalf), 7.2(d) (a lawyer shall not give anything of value to a person for recommending the lawyer’s services), 8.4(a), 8.4(b), and 8.4(c).

Recommendation of the Hearing Committee (Felony Conviction Matter)

Prior to a hearing on the formal charges, respondent filed a petition for consent discipline in which he sought the imposition of disbarment for his conviction. The ODC concurred in the petition, and the disciplinary board recommended the proposed discipline be accepted. However, on April 24, 2002, we rejected the petition for consent discipline and remanded the matter for consideration of the previously filed formal charges. Our order further instructed that on remand, “the hearing committee and disciplinary board may consider recommendation of the sanction of permanent disbarment, if appropriate, pursuant to Supreme Court Rule XIX, §§ 10(a) and 24, as amended effective August 1, 2001.” In re: O’Keefe, 01-1643 (La.4/24/02), 814 So.2d 1288.
By agreement of the parties, no formal hearing was conducted on remand and the matter was considered on documentary evidence alone. The hearing committee found the formal charges were proven by clear and convincing evidence and recommended that respondent be permanently disbarred.

_J^Recommendation of the Hearing Committee (Solicitation Matter)

After some delays related to discovery issues, this matter proceeded to a formal *85 hearing on the merits, which was conducted by the hearing committee on May 20, 2002. The ODC submitted documentary evidence in support of the formal charges and called Ernest Aiavolasiti, Michael Pal-misano, Greer Goff, Stephen Bernstein, and Dr. Mark Schwaiger, among others, to testify before the committee. Respondent was incarcerated at the time of the hearing and thus did not appear in person. He elected not to retain counsel to represent him at the hearing and called no witnesses on his behalf. However, respondent submitted written questions which were posed to the ODC’s witnesses by the hearing committee chairman on cross-examination.
At the conclusion of the hearing, the committee found respondent violated Rule 7.2(a) by soliciting clients for his personal injury practice though the use of runners. The committee further found respondent violated Rule 7.2(d) by paying runners and other non-lawyers to obtain clients for his personal injury practice. Additionally, the committee found respondent violated Rule 5.5(b) by assisting Mr. Aiavolasiti and Mr. Palmisano in the unauthorized practice of law. The committee determined respondent violated Rule 8.4(a) by violating the Rules of Professional Conduct, both personally and through Mr. Bernstein. Finally, the committee found respondent committed a criminal act, and thus violated Rule 8.4(b), when he paid Mr. Aiavolasiti, Mr. Palmisano, and runners to procure cases for his firm.[8]
The committee found respondent’s conduct violated duties owed to clients, to the legal system, and the profession. Given the extensive planning involved, respondent’s actions were clearly intentional. His actions resulted in actual and potential injury. It found hundreds of clients were deprived of the considered legal Imjudgment of an attorney during the course of their representation. The legal system and the profession suffer actual injury when a lawyer engages in runner-based solicitation, a felony under state law. Based on the ABA’s Standards for Imposing Lawyer Sanctions and the strong public policy expressed by this court in prior solicitation cases, the committee determined the baseline sanction for respondent’s misconduct is disbarment.
As aggravating factors, the committee recognized respondent’s prior disciplinary offenses, dishonest or selfish motive, a pattern of misconduct, multiple offenses, bad faith obstruction of the disciplinary proceeding, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victims, and substantial experience in the practice of law (admitted 1955). The committee found no mitigating factors are present. Under these circumstances, and considering the permanent disbarment guidelines set forth in Appendix E to the Rules for Lawyer Disciplinary Enforcement, the committee recommended that respondent be permanently disbarred.

Disciplinary Board Recommendation

Based on the documentary evidence in the record in the felony conviction matter, the board found this charge was proven by clear and convincing evidence. The board concluded that permanent disbarment is the appropriate sanction.
Likewise, the board found the record supports the committee’s factual findings in the solicitation matter. The board agreed that permanent disbarment is the appropriate sanction for this misconduct.
Respondent filed an objection to the disciplinary board’s recommendation in the solicitation matter only, conceding that *86 permanent disbarment is appropriate in the|nfelony conviction matter. Accordingly, this case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const, art. V, § 5(B). When the disciplinary proceedings involve an attorney who has been convicted of a exime, the conviction is conclusive evidence of guilt and the sole issue presented is whether respondent’s crimes warrant discipline, and if so, the extent thereof. Supreme Court Rule XIX, § 19(E); In re: Boudreau, 02-0007 (La.4/12/02), 815 So.2d 76; Louisiana State Bar Ass’n v. Wilkinson, 562 So.2d 902 (La.1990). The discipline to be imposed depends on the seriousness of the offense and the extent of the aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Perez, 550 So.2d 188 (La.1989).
Respondent was convicted in federal court in 1996 on charges of bilking millions of dollars from a failed insurance company. The hearing committee and disciplinary board found, and respondent concedes, that permanent disbarment is a proper sanction for this conviction. We agree. Respondent has been convicted of a “serious crime,” as defined by Supreme Court Rule XIX, § 19, and that conviction ■ was preceded by x-espondent’s disbarment for a prior conviction of a serious exime. Permanent disbarment is therefore wholly appropriate under Guideline 9 of the permanent disbarment guidelines set forth in Appendix E to the Rules for Lawyer Disciplinary Enforcement.
Ordinarily, this finding would end our inquiry. Because the imposition of permanent disbarment is the most severe sanction that can be imposed on a lawyer, having the effect of forever removing the lawyer from the bar of this state, there is bogenerally no need to discuss any additional misconduct the lawyer may have committed. However, the ODC asks us to make a finding of the appropriate sanction for the solicitation charges, because this sanction could become relevant in the event respondent’s criminal conviction is reversed in post-conviction proceedings. Accordingly, we now address the solicitation matter.
Procedurally, respondent argues that he has been unable to defend the formal charges arising out of the runner-based solicitation scheme because he has not been given notice of the misconduct with which he is charged. We find no merit to this argument.
In In re Ruffalo, 390 U.S. 544, 550, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), the United States Supreme Court held that a lawyer facing discipline is “entitled to procedural due process, which includes fair notice of the charge.” Likewise, Supreme Court Rule XIX, § 11(E) requires that formal charges of misconduct must “give fair and adequate notice of the nature of the alleged misconduct.”
A review of the ODC’s formal charges in the solicitation matter, as amended on July 13, 2001, reveals these charges contain a detailed factual statement of respondent’s activities in connection with the solicitation matter. The charges allege that respondent’s activities, either directly or through the individuals named in the formal charges, violated Rules 7.2(a), 7.2(d), 5.5(b), 8.4(b), 8.4(c), and 8.4(a). These charges unquestionably gave respondent fair and adequate notice of the nature of the professional violations alleged by the ODC.
Having found no merit to respondent’s procedural objections, we now consider *87 whether the ODC met its burden of proving that respondent committed the misconduct alleged in the formal charges.
|13Pursuant to our original jurisdiction in bar disciplinary matters, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass’n v. Boutall, 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
Having reviewed the voluminous record of these proceedings, we find no error in the hearing committee’s factual findings that respondent knowingly engaged in a scheme whereby he improperly solicited clients through paid runners and fostered the unauthorized practice of law by non-lawyers. The ODC presented testimony from key participants in the runner-based solicitation scheme. Without exception, these witnesses testified that respondent had a central role in the scheme. The hearing committee, which had the benefit of actually seeing and hearing these witnesses, found their testimony to be credible. Nothing in the record suggests that we should disregard that finding. See In re: Bolton, 02-0257 (La.6/21/02), 820 So.2d 548 (“Although this court is the trier of fact in bar disciplinary cases, we are not prepared to disregard the credibility evaluations made by those committee members who were present during respondent’s testimony and who act as the eyes and ears of this court.”). The factual findings of the hearing committee support the conclusion that respondent violated the Rules of Professional Conduct as charged in the amended formal charges.
Having found professional misconduct, the next issue presented for our consideration is the appropriate sanction to be imposed. In considering that issue, we | uare mindful that the purpose of lawyer disciplinary proceedings is not primarily to punish the lawyer, but rather to maintain appropriate standards of professional conduct to safeguard the public, to preserve the integrity of the legal profession, and to deter other lawyers from engaging in violations of the standards of the profession. Louisiana State Bar Ass’n v. Guidry, 571 So.2d 161 (La.1990). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
This court has long condemned the practice of soliciting clients for pay. In Louisiana State Bar Ass’n v. Beard, 374 So.2d 1179, 1181 (La.1979), we explained that solicitation of clients for pay cannot be condoned as “the professional character of the practice of law could not survive the hunting down and marketing of personal injury claims.” In Louisiana State Bar Ass’n v. St. Romain, 560 So.2d 820 (La.1990), we explained that “[s]olicitation is abhorrent to the legal profession and places lawyers in disrepute with the public.” See also In re: D’Amico, 94-3005 (La.2/28/96), 668 So.2d 730 (solicitation “undermines the reputation of lawyers generally and the public’s attitude toward the profession.”). The serious nature of this misconduct is further reflected in our specific reference to it in the permanent disbarment guidelines set forth in Appendix E to Supreme Court Rule XIX. Guideline 6 suggests permanent disbarment may *88 be appropriate when the lawyer engages in “[ijnsurance fraud, including but not limited to staged accidents or widespread runner-based solicitation.” We have not hesitated to permanently disbar lawyers who knowingly participate in such activities. See In re: Kirchberg, 03-0957 (La.9/26/03), 856 So.2d 1162; In re: Laudumiey & Mann, 03-0234 (La.6/27/03), 849 So.2d 515, cert. denied, — U.S.-, 124 S.Ct. 814, 157 L.Ed.2d 697 (2003).
| ^Unquestionably, respondent was at the epicenter of one of the largest runner-based solicitation schemes in Louisiana. Although respondent may not have originated the scheme, it is clear that it could not have existed without his funding and cooperation. Respondent’s attempts to insulate himself from culpability though the formation of sham law corporations serves only to aggravate the seriousness of his actions. Rather than using his experience as a senior member of the bar to foster the highest ideals of professionalism in the younger attorneys working under him, respondent used these attorneys as pawns in his scheme. In addition to the harm to the countless clients who were unknowingly drawn into his solicitation scheme, respondent’s activities caused grave harm to the entire legal profession in Louisiana.
It is particularly disturbing that in 1989, in connection with his application for readmission to the bar, respondent represented to us that he had reformed following his 1983 conviction and that he possessed the moral fitness to return to the practice of law. It is now painfully obvious to this court that those representations were hollow. Instead of learning from his prior discipline, respondent almost immediately began engaging in the improper activities which culminated in his second criminal conviction and the runner-based solicitation charges.
In summary, this record demonstrates beyond any doubt whatsoever that respondent lacks the good moral character and fitness to practice law in Louisiana. In the face of the indisputable evidence of such a fundamental lack of moral fitness, we can conceive of no circumstance under which we would ever grant readmission to respondent. Accordingly, we find respondent must be permanently disbarred for his felony conviction. Additionally, we find that his activities in the runner-based solicitation matter form a separate and independent ground for which he must also be permanently disbarred.
| ir,DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that the name of Michael H. O’Keefe, Louisiana Bar Roll number 9951, be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked based on his felony conviction as well as his activities in the runner-based solicitation matter. Pursuant to Supreme Court Rule XIX, § 24(A), it is further ordered that respondent be permanently prohibited from being readmitted to the practice of law in this state. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.

. Following respondent's 1996 federal conviction, which forms the basis of a portion of the current charges, the ODC filed a motion for interim suspension pursuant to Supreme Court Rule XIX, § 19. We granted the motion on March 24, 1999. In re: O’Keefe, 99-0296 (La.3/24/99), 733 So.2d 1179.

. Respondent, who for a number of years served as the president of the Louisiana State Senate, had minimal personal involvement in the law firm's practice. One of the witnesses described respondent’s function as more in the nature of an "of counsel” to the firm.

. The practice was particularly prevalent along Canal Street in New Orleans; indeed, that part of the New Orleans legal community that engaged in the runner-based solicitation of personal injury clients became known as the "Canal Street Cartel.”

. Over time, the volume of incoming cases grew to an average of 100 new personal inju *83 ry cases per month.

. In most of Ms. Goff’s cases, the sum of $700 was deducted from the total legal fee to recoup the money paid to the runners. This entry was noted on the internal firm disbursement sheet as an “investigation report.” The balance of the legal fee was then paid to O'Keefe & O'Keefe, A.P.L.C. and O’Keefe, O’Keefe & Bernstein.

. Dr. Schwaiger testified that he obtained between 300 and 500 cases from respondent, and that the medical expenses in those cases averaged between $1,000 and $1,500 each. In turn, Dr. Schwaiger paid respondent $100 to $200 in cash for each case.

. On January 29, 1999, we accepted a petition for consent discipline suspending Mr. Bernstein for three years, with one year deferred, for his role in the runner-based personal injury practice. In re: Bernstein, 98-3207 (La. 1/29/99), 725 So.2d 483. On January 28, 2003, we suspended Ms. Goff for nine months, with six months deferred, for her role in the practice. In re: Goff, 02-1899 (La. 1/28/03), 837 So.2d 1201. In addition, Mr. Bernstein, Mr. Aiavolasiti, Mr. Palmisano, and Dr. Schwaiger all entered guilty pleas in a federal investigation of the runner-based solicitation industry in New Orleans.

. The committee pointed out that La. R.S. 37:219 makes it a felony for a lawyer to pay anything of value to another for purposes of securing clients.